**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

PARK VILLAGE APARTMENT TENANTS
ASSOCIATION; WILLIAM FOSTER;
SHIRLEY SMITH; CORNELIUS
WEEKLEY,

    *Plaintiffs-Appellees,*

v.

MORTIMER HOWARD TRUST;
MORTIMER R. HOWARD,

    *Defendants-Appellants.*

No. 10-15303

D.C. No.
4:09-cv-04780-SBA

OPINION

Appeal from the United States District Court
for the Northern District of California
Saundra B. Armstrong, District Judge, Presiding

Argued and Submitted
July 13, 2010—San Francisco, California

Filed February 25, 2011

Before: William A. Fletcher and Milan D. Smith, Jr.,
Circuit Judges, and James D. Todd, Senior District Judge.*

Opinion by Judge Milan D. Smith, Jr.;
Partial Concurrence and Partial Dissent by
Judge William A. Fletcher

---

*The Honorable James Dale Todd, Senior United States District Judge
for the Western District of Tennessee, sitting by designation.

2903

**COUNSEL**

Thomas Melvin Swihart, Berkeley, California, for the defendant-appellant.

James Russell Grow, Kent Kang Qian, National Housing Law Project, Oakland, California; Lisa Shouse Greif, Bay Area Legal Aid, Oakland, California, for the plaintiffs-appellees.

## OPINION

M. SMITH, Circuit Judge:

The individual Plaintiffs are a group of elderly, low-income tenants of a former project-based, federally subsidized Section 8 housing complex. They argue that federal law gives them a right to remain in the complex and to pay a portion of their rent by using federally funded "enhanced vouchers." Defendants, who own the housing complex, argue that the tenants have no right to remain in the complex or to use such vouchers to pay their rent. Defendants further contend that even if the tenants have a right to remain in the complex and to pay a portion of their rent relying on such vouchers, a court cannot compel them to enter into a contract with the local housing authority that would require them to provide a certain level of service to tenants of the complex, so long as Defendants are willing to forego payment of that portion of the rent covered by the "enhanced vouchers."

The district court entered a preliminary injunction in favor of "any tenant at Park Village Apartments." We affirm in part because the individual Plaintiffs have a statutory right to remain in the complex, and are, accordingly, entitled to an injunction barring Defendants from evicting them solely because they are paying only their statutorily determined portion of each month's rental payment. However, we reverse and remand in part because Plaintiffs have not identified any evidence or statutory authority upon which to base a mandatory injunction compelling Defendants to enter contracts with the local housing authority, so long as Defendants are willing to forego payment of that portion of the rent covered by the "enhanced vouchers."

## FACTUAL AND PROCEDURAL BACKGROUND

### A.  Statutory Background

For almost four decades, the federal government has provided rental assistance to low-income, elderly, and disabled families through the Section 8 housing program. Congress added the program to the United States Housing Act of 1937 by enacting Title II of the Housing and Community Development Act of 1974, Pub. L. No. 93-383, § 201(a), 88 Stat. 633, 662-66 (1974) (codified as amended at 42 U.S.C. § 1437f). Congress did so "[f]or the purpose of aiding low-income families in obtaining a decent place to live and of promoting economically mixed housing." 42 U.S.C. § 1437f(a); *see generally Barrientos v. 1801-1825 Morton LLC*, 583 F.3d 1197, 1202 (9th Cir. 2009).

Section 8 assistance may be either "project-based" or "tenant-based." 24 C.F.R. § 982.1(b)(1). Project-based assistance is appurtenant to specific housing units, pursuant to which the government provides rental assistance payments to unit owners on behalf of low-income tenants in those units. *Id.* Tenant-based assistance, on the other hand, is appurtenant to the tenant, pursuant to which the tenant may retain a rental subsidy when he or she moves to another Section 8 housing unit. *See* 42 U.S.C. § 1437f(o), (r); 24 C.F.R. §§ 982.1(b)(1), 982.314, 982.353, 982.355. Under both forms of assistance, the tenant contributes a prescribed portion of family income toward the rent due, ordinarily the greater of 30 percent of "adjusted income" or 10 percent of gross income. 42 U.S.C. § 1437f(o)(2); *see also id.* § 1437a(a)(1). The government pays the balance of the rent to the owner, up to a "payment standard" for the dwelling unit, which ordinarily cannot exceed 110% of a local "fair market rental" value established by the Department of Housing and Urban Development (HUD). *See id.* § 1437f(c), (o)(1)-(2). The Section 8 program is funded by the federal government and administered by

local public housing authorities (PHAs). *Barrientos*, 583 F.3d at 1202.

Beginning in the late 1980s, an increasing number of subsidized unit owners became eligible to prepay mortgages, or to terminate or not renew their contracts with HUD for project-based and other forms of unit-based federal housing assistance. *Id.* at 1202-03. Congress enacted new laws to protect tenants in assisted units in the event the owner sought to convert the previously subsidized units to market-rate housing. An early protection was a notice requirement, enacted as part of the Housing and Community Development Act of 1987. *See* Pub. L. No. 100-242, § 262(a), 101 Stat. 1815, 1890-91 (1988) (codified as amended at 42 U.S.C. § 1437f(c)(8)). In its current form, this protection requires that the owner provide tenants and the Secretary of HUD (Secretary) with an opt-out notice not less than one year before the proposed termination. 42 U.S.C. § 1437f(c)(8)(A). An owner may not evict tenants or increase the rent until one year after providing such notice. *Id.* § 1437f(c)(8)(B). The notice must also "comply with any additional requirements established by the Secretary." *Id.* § 1437f(c)(8)(C).

As more Section 8 project-based assistance contracts began to expire in the late 1990s, Congress created an "enhanced voucher" program, culminating in the enactment of permanent enhanced voucher authority in 1999. *See* Pub. L. No. 106-74, 113 Stat. 1047, 1109-15, 1121-24 (1999). The 1999 statute had several features. First, it enacted the notice provisions of § 1437f(c)(8) in their current form. *Id.* § 535, 113 Stat. at 1121. Second, it obligated the Secretary to provide "enhanced vouchers" to tenants residing in project-based subsidized units at the time of termination:

> In the case of a contract for project-based assistance under section 8 for a covered project that is not renewed . . . upon the date of the expiration of such contract the Secretary shall make enhanced voucher

assistance . . . available on behalf of each low-income family who, upon the date of such expiration, is residing in an assisted dwelling unit in the covered project.

*Id.* § 531(a), 113 Stat. at 1113 (codified at 42 U.S.C. § 1437f note, Multifamily Assisted Housing Reform and Affordability Act of 1997, § 524(d)(1) (hereinafter MAHRAA)).

Third, and most importantly for purposes of our opinion, it added a new subsection (t) to Section 8, setting forth various rules governing enhanced vouchers. *Id.* § 538(a), 113 Stat. at 1122-23. This subsection provided that enhanced vouchers are equivalent to ordinary vouchers as set forth in § 1437f(o), with certain key differences. Most significantly, it provided that

> *during any period that the assisted family continues residing in the same project* in which the family was residing on the date of the eligibility event[1] for the project, if the rent for the dwelling unit of the family in such project exceeds the applicable payment standard established pursuant to subsection (o) for the unit, the amount of rental assistance provided on behalf of the family shall be determined using a payment standard that is equal to the rent for the dwelling unit (as such rent may be increased from time-to-time), subject to paragraph (10)(A) of subsection (o)[.]

*Id.* (codified at 42 U.S.C. § 1437f(t)(1)(B) (emphasis added)). By making the "payment standard . . . equal to the rent for the dwelling unit," the statute entitles a tenant with an enhanced voucher to have the federal government pay the difference

---

[1]"Eligibility event" includes "the termination or expiration of the contract for rental assistance under this section for such housing project." 42 U.S.C. § 1437f(t)(2).

between the designated percentage of the tenant's income payable by the tenant and the market-rate rent for a dwelling unit where he or she resided, even where that amount exceeds the otherwise "applicable payment standard." *Id.* § 1437f(o)(1)-(2), (t)(1)(B). The total rent charged by the owner is subject to no specific limit except that it must "be reasonable in comparison with rents charged for comparable dwelling units in the private, unassisted local market." *Id.* § 1437f(o)(10)(A).

In a trio of enactments in 2000, Congress amended the enhanced voucher provision to make it even more protective of tenants. It now provides:

> [*T*]*he assisted family may elect to remain in the same project* in which the family was residing on the date of the eligibility event for the project, and if, during any period the family makes such an election and continues to so reside, the rent for the dwelling unit of the family in such project exceeds the applicable payment standard established pursuant to subsection (o) of this section for the unit, the amount of rental assistance provided on behalf of the family shall be determined using a payment standard that is equal to the rent for the dwelling unit (as such rent may be increased from time-to-time), subject to paragraph (10)(A) of subsection (o) of this section and any other reasonable limit prescribed by the Secretary, except that a limit shall not be considered reasonable for purposes of this subparagraph if it adversely affects such assisted families[.]

Pub. L. No. 106-246, § 2801, 114 Stat. 511, 569 (July 13, 2000); Pub. L. No. 106-377, § 1(a)(1), 114 Stat. 1441, 1441A-24 (Oct. 27, 2000); Pub. L. No. 106-569, § 903(a), 114 Stat. 2944, 3026 (Dec. 27, 2000) (codified at 42 U.S.C. § 1437f(t)(1)(B) (emphasis added)).

## B.   Factual and Procedural Background

The Plaintiffs are individual elderly and disabled low-income tenants, and an unincorporated association of tenants, in the Park Village Apartments (the Apartments). The Apartments are a former project-based federally subsidized housing development in Oakland, California. Defendants are the Mortimer Howard Trust, the owner of the Apartments since 2006, and Mortimer R. Howard, the former owner of the Apartments and the trustee of the trust.

The Apartments were developed in 1978 with the assistance of Section 8 project-based rental subsidies. After Defendants' final project-based contract with HUD expired in 2005, they declined to renew the contract and sought to raise the individual Plaintiffs' rents to the fair market rate.

In a prior action, the district court enjoined the proposed rent increase because Defendants failed to comply with the notice requirements of § 1437f(c)(8). We affirmed. *Park Vill. Apartments Tenants Ass'n v. Mortimer Howard Trust*, No. 06-7389, 2007 WL 519038 (N.D. Cal. Feb. 14, 2007), *aff'd*, 252 F. App'x 152 (9th Cir. 2007). Defendants served a new notice in May 2007. Plaintiffs again complained that the notice was invalid, and on July 16, 2008, the district court handed down another injunction. That injunction forbade the Defendants from increasing rents or evicting tenants in the complex due to non-payment of increased rent until Defendants properly complied with the notice requirements. Defendants served another notice on July 25, 2008. This notice was effective. It contained the following certification, required by the Secretary:

> Federal law allows you to elect to continue living at this property provided that the unit, the rent, and I, the Owner, meet the requirements of the tenant-based assistance program. As an Owner, I will honor your right as a tenant to remain at the property on

this basis as long as it continues to be offered as rental housing, provided that there is no cause for eviction under Federal, State or local law.

Termination of the project-based contract with HUD became effective one year after Defendants' July 25, 2008 notice. As a result, Defendants were permitted to raise rents at the Apartments, and the individual Plaintiffs became eligible for enhanced Section 8 rental assistance vouchers. *See* 42 U.S.C. § 1437f note, MAHRAA § 524(d). HUD authorized the Oakland Housing Authority to issue enhanced vouchers for renters in the Apartments as of July 25, 2009. On August 31, 2009, Defendants served notice of a rent increase, effective October 1, 2009, to individual Plaintiffs. The amount of the rent increase is not at issue here.

Defendants refused to accept the individual Plaintiffs' vouchers, and declined to enter into contracts with the Oakland Housing Authority, which was a condition precedent to Defendants' being eligible to be paid for the vouchers. Defendants notified certain individual Plaintiffs that they would be evicted if they failed to pay the full amount of rent then being charged by Defendants. Plaintiffs again returned to the federal district court. On January 29, 2010, the district court handed down a preliminary injunction, ordering Defendants to refrain from collecting, except through enhanced vouchers, the amount of the increased rents covered by the vouchers; to refrain from evicting any tenant for nonpayment of the amount covered by the enhanced vouchers; and to take all steps necessary to enter into and execute Housing Assistance Payments (HAP) contracts with the Oakland Housing Authority.

## JURISDICTION AND STANDARD OF REVIEW

Defendants timely appealed the district court's grant of the preliminary injunction. We have jurisdiction under 28 U.S.C. § 1292(a)(1).

Plaintiffs are entitled to a preliminary injunction if they show that "(1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest." *Cal. Pharmacists Ass'n v. Maxwell-Jolly*, 596 F.3d 1098, 1104 (9th Cir. 2010), *cert. granted on other grounds*, 2011 WL 134273 (U.S. Jan. 18, 2011).

We have set forth the standard of review for preliminary injunction appeals as follows:

> A district court's decision to grant or deny a preliminary injunction is reviewed for abuse of discretion. We recently restated our two-part test used to determine whether a district court has abused its discretion. First, we "determine de novo whether the trial court identified the correct legal rule to apply to the relief requested." If the trial court did not identify the correct legal rule, it abused its discretion.

> Second, we must determine if the district court's "application of the correct legal standard was (1) 'illogical,' (2) 'implausible,' or (3) without 'support in inferences that may be drawn from the facts in the record.'"

*Id.* (internal citations omitted).

## DISCUSSION

### A.   Right To Remain and Enhanced Vouchers

Defendants contend that the enhanced voucher provisions merely require that HUD provide vouchers to eligible tenants. They argue that the statute does not require them to permit tenants to remain in the Apartments, and does not require them to accept enhanced vouchers as payment for rent. Stated

another way, Defendants claim that they may raise rents in the Apartments to the fair market rate, and may refuse to accept vouchers in partial payment of those increased rents.

**[1]** In its current form, the relevant portion of the statute provides:

> [*T*]*he assisted family may elect to remain in the same project* in which the family was residing on the date of the eligibility event for the project, and if, during any period the family makes such an election and continues to so reside, the rent for the dwelling unit of the family in such project exceeds the applicable payment standard established pursuant to subsection (o) for the unit, the amount of rental assistance provided on behalf of the family shall be determined using a payment standard that is equal to the rent for the dwelling unit . . . .

42 U.S.C. § 1437f(t)(1)(B) (emphasis added). The Secretary has interpreted the italicized language as giving eligible tenants a "right to remain," enforceable against owners who would seek to evict them, so long as the tenants pay their portion of the rent as defined in Section 8. Every federal court to consider the question to date has agreed with the Secretary's construction of 42 U.S.C. § 1437f(t)(1)(B). *See Feemster v. BSA Ltd. P'ship*, 548 F.3d 1063 (D.C. Cir. 2008), *aff'g in relevant part*, 471 F. Supp. 2d 87 (D.D.C. 2007); *Barrientos v. 1801-1825 Morton, LLC*, No. 06-6437, 2007 WL 7213974 (C.D. Cal. Sept. 11, 2007), *aff'd on other grounds*, 583 F.3d 1197 (9th Cir. 2009); *Estevez v. Cosmopolitan Assocs. LLC*, No. 05-4318, 2005 WL 3164146 (E.D.N.Y. Nov. 28, 2005); *Jeanty v. Shore Terrace Realty Ass'n*, No. 03-8669, 2004 WL 1794496 (S.D.N.Y. Aug. 10, 2004).

**[2]** We also agree with the Secretary's construction of § 1437f(t). The statute gives "assisted families" the right "to remain in the same project." The statute also authorizes own-

ers to raise their rents to a reasonable market rate and to receive a housing assistance payment, by means of an enhanced voucher, to cover the authorized increases in rent. It does not authorize owners to raise their rents to a reasonable market rate, but then to refuse to accept payment by means of an enhanced voucher, and evict an "assisted family" for nonpayment of rent. Practically, the statute requires owners to permit tenants to remain in the housing complex while paying only their statutorily prescribed portion of the rent.

Our reading (and the Secretary's reading) of § 1437f(t) is supported both by the plain language of the statute, and by the language of the statutory provision that preceded it. A year before the enactment of the current statutory language, Congress had enacted language that did not explicitly provide a right to remain. That earlier statutory language had simply provided that a family was entitled to an enhanced voucher "during any period that the assisted family continues residing in the same project." Pub. L. No. 106-74, § 538, 113 Stat. 1047, 1122 (1999). Congress then amended the statute in 2000 explicitly to provide that "the assisted family may elect to remain in the same project." Pub. L. No. 106-246, § 2801, 114 Stat. 511, 569 (2000).

Defendants contend that § 1437f(t) confers a right that is enforceable against only the Secretary. They assert that the 2000 amendment requires the Secretary to provide enhanced vouchers to eligible tenants, and that it prevents the Secretary from forcing a tenant with an enhanced voucher to leave his or her dwelling unit, but that it places no obligation on an owner of the unit.

We disagree with Defendants' reading of § 1437f(t). First, if Congress's intent in amending the statute in 2000 had been merely to provide that the Secretary was obligated to supply families with enhanced vouchers while they remained in their existing units, the amendment making explicit the tenant's right to remain would have been unnecessary. Second, there

is a separate statutory provision that already required the Secretary to provide enhanced vouchers to eligible families. *See* 42 U.S.C. § 1437f note, MAHRAA § 524(d).

Further, HUD's Section 8 Renewal Policy Guide provides that under § 1437f(t)(1)(B), tenants with enhanced vouchers have a right to remain, and that owners must honor that right. *See* U.S. DEP'T OF HOUS. & URBAN DEV., SECTION 8 RENEWAL POLICY: GUIDANCE FOR THE RENEWAL OF PROJECT-BASED SECTION 8 CONTRACTS (Jan. 15, 2008), at 8-1, 11-3B (hereinafter Guide). The Guide conditions an owner's ability to opt-out of the project-based assistance program on the owner's provision of an "acceptable one-year notification" to tenants, including a letter "stat[ing] that the owner will honor the right of residents to remain," and on certification to HUD that the owner "will honor the tenants['] right to remain at the property as long as it continues to be offered for rental housing if the PHA approves a rent equal to the new rent charged for the unit, unless the owner has grounds for eviction under State or local law." *Id.* at 8-1A.3; *see also id.* at 1-5.I. The Guide provides that the right to remain lasts "[a]s long as the property is offered for rental housing," and that the "owners must continually renew the lease of an enhanced voucher family," "absent good cause to terminate tenancy." *Id.* at 11-3B.2. The Guide is an agency interpretation not entitled to *Chevron* deference, but it is nevertheless " 'entitled to a measure of respect under the less deferential *Skidmore* standard.' " *Barrientos*, 583 F.3d at 1214 (quoting *Fed. Express Corp. v. Holowecki*, 552 U.S. 389, 399 (2008)).

Furthermore, every court to consider the question has concluded that § 1437f(t) affords tenants a right to remain, exercisable as against the owner. *Feemster*, 548 F.3d at 1069 ("[T]he district court correctly determined that the tenants' right under § 1437f(t) to remain in their homes, and to pay their rent with enhanced vouchers, is secure unless and until their tenancies are validly terminated under [local] law."); *Barrientos*, 2007 WL 7213974, at *6 ("[T]he enhanced

voucher provision creates a right for tenants to remain in tenancy upon an 'eligibility event' as defined in that provision. The plain language of the statute . . . indicates that it is up to the assisted family, not the owner, to decide whether to continue tenancy upon occurrence of the eligibility event."); *Estevez*, 2005 WL 3164146, at *4 ("The text of 42 U.S.C. § 1437f(t), given its ordinary meaning, makes clear that tenants renting apartments in developments receiving project-based assistance will, upon the termination of that assistance, have the right to remain in their apartments as long as they remain eligible and continue to occupy the apartments."); *Jeanty*, 2004 WL 1794496, at *3 ("Giving the words used in 42 U.S.C. § 1437f(t)(1) and (2) their ordinary meaning, it is clear that the statute provides families renting at the time of the termination of the project-based subsidy contract the right to remain in their units, using enhanced vouchers, for so long as the tenant remains eligible for the vouchers or until the tenant is evicted.").

**[3]** Defendants have not offered any persuasive reason why we should flout the clear language of the statute, or depart from the Secretary's or numerous federal courts' constructions of the statute. We therefore hold that § 1437f(t) provides tenants a right to remain in their rental units absent just cause for eviction, and that tenants with enhanced vouchers cannot be required to pay more than the tenant's portion of the rent as defined by the Section 8 statute and applicable regulations.

## B.   Right to Remain and Notice

**[4]** Defendants further argue that even if § 1437f(t)(1)(B) may be read in isolation to provide a tenant right to remain in his or her rental unit, such a reading is clearly inconsistent with the notice provisions of § 1437f(c)(8). The notice provisions provide that an owner may not evict tenants or increase the rent until one year after providing an "opt-out" notice to tenants and the Secretary. 42 U.S.C. § 1437f(c)(8). Defen-

dants argue that it follows from § 1437f(c)(8) that they have a right to evict tenants or increase their rent after giving proper notice, and the passage of one year's time. *See id.* § 1437f(c)(8)(B). Section 1437f(c)(8)(A) provides that "[t]he notice shall also include a statement that . . . in the event of termination the Department of Housing and Urban Development will provide tenant-based rental assistance to all eligible residents, enabling them to choose the place they wish to rent, which is likely to include the dwelling unit in which they currently reside." Defendants argue that the statutory statement that tenants' choice of dwelling in the event of termination "is *likely* to include the dwelling unit in which they currently reside" is inconsistent with the tenants' *right* to remain.

**[5]** We disagree with Defendants, and conclude that the notice provisions in § 1437f(c)(8) must be harmonized with the later-enacted enhanced voucher provision in § 1437f(t)(1)(B). The notice provisions, like the enhanced voucher provisions, were enacted to protect tenants. The Secretary has harmonized these two sets of tenant-protective provisions by requiring that the notice contemplated in § 1437f(c)(8) incorporate and refer to the "right to remain" provided by § 1437f(t)(1)(B). *See* 42 U.S.C. § 1437f(c)(8)(C) (providing that "[a]ny notice under this paragraph shall also comply with any additional requirements established by the Secretary"); Guide at 8-1A.3 (requiring that notice "state that the owner will honor the right of residents to remain").

**[6]** We therefore conclude that the Secretary has appropriately harmonized these two provisions. Congress first enacted notice requirements in 1988. It enacted them in their current form when it authorized enhanced vouchers in 1999. Then, as recounted *supra*, Congress amended the statute in 2000 explicitly to provide a right to remain. Reading these enactments as the Secretary does is consistent both with the statutory text and with Congress's intent to protect tenants in expiring project-based units.

## C.  Preliminary Injunction

Having concluded that § 1437f(t) provides Plaintiffs a "right to remain" in their current units, and that this right is enforceable against Defendants, we next examine the propriety of the district court's preliminary injunction. Defendants argue that even if they must continue to rent apartments to the individual Plaintiffs and to accept the individual Plaintiffs' out-of-pocket share of the market rental rates, they need not enter into housing assistance payments (HAP) contracts with the local housing authority, as ordered in Section V.C of the district court's injunction. Stated another way, Defendants contend that if they are willing to accept reduced rents from the individual Plaintiffs and forgo the funds that enhanced vouchers would provide, they cannot be compelled to enter into HAP contracts.

As noted *supra*, we review for abuse of discretion the district court's conclusion that Plaintiffs established that "(1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest." *Cal. Pharmacists Ass'n*, 596 F.3d at 1104.

To better frame our analysis, we consider the two parts of the district court's injunction separately. The first part of the injunction (Sections V.A and V.B of the district court's order) bars Defendants from increasing the individual Plaintiffs' rent unless Defendants accept enhanced vouchers, and further bars Defendants from evicting tenants so long as the Plaintiff tenants continue to pay their out-of-pocket Section 8 contribution. This portion of the district court's injunction is "prohibitory" in nature, since it "prohibits a party from taking action and preserves the status quo pending a determination of the action on the merits." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 878 (9th Cir. 2009) (alteration and internal quotation marks omitted). The

second part of the injunction (section V.C of the district court's order) requires Defendants to "take all steps necessary to enter into and execute housing assistance payment contracts with the Oakland Housing Authority for the acceptance of tenant based vouchers." This part of the injunction is "mandatory" in nature, since it "orders a responsible party to take action." *Id.* at 879 (internal quotation marks omitted).

### 1.  Prohibitory Injunction

**[7]** With respect to the prohibitory portion of the injunction, the district court correctly determined that Plaintiffs were likely to succeed on the merits because § 1437f(t)(1)(B) confers on the individual Plaintiffs a right to remain in their rental units. The district court also correctly determined that the individual Plaintiffs were likely to suffer irreparable harm absent preliminary relief because they faced eviction from their rental units. Defendants communicated an intention to charge market rates for the individual Plaintiffs' apartments, and Plaintiffs demonstrated an inability to pay those market rates. Defendants have further voiced an intention to refuse to accept enhanced vouchers, and to evict Plaintiffs for non-payment of market rates. It is well-established that the loss of an interest in real property constitutes an irreparable injury. *See McNeill v. N.Y. C. Hous. Auth.*, 719 F. Supp. 233, 254 (S.D.N.Y. 1989) (holding that risk of eviction from Section 8 housing satisfies irreparable injury prong of preliminary injunction test) (collecting cases); *accord Sundance Land Corp. v. Cmty. First Fed. Sav. & Loan Ass'n*, 840 F.2d 653, 661 (9th Cir. 1988) (holding that threatened foreclosure of real property gave rise to "immediate, irreparable injury"). Given the district court's factual findings regarding the likelihood of eviction, it reasonably concluded that Defendants' threat to evict Plaintiffs created a likelihood of irreparable harm in the absence of an injunction barring future evictions. *See, e.g.*, *Enyart v. Nat'l Conf. of Bar Exam'rs, Inc.*, Nos. 10-15286, 10-16392, 2011 WL 9735, at *11 (9th Cir. Jan. 4, 2011) ("Because the district court's finding of irreparable

harm . . . is supported by facts in the record, it does not constitute an abuse of discretion."); *Dominguez v. Schwarzenegger*, 596 F.3d 1087, 1098 (9th Cir. 2010).

**[8]** The district court also properly evaluated the balance of hardships and the public interest together. *See Cal. Pharmacists Ass'n*, 596 F.3d at 1114-15 (considering these factors in tandem). The court concluded that the individual Plaintiffs' risk of eviction, the fact that Defendants would not be unduly burdened by the proposed injunction because they would continue to receive market value rent for their rental units, and the public's interest in compliance with the Section 8 statute, all militated in favor of preliminary relief. None of these findings was clearly erroneous. The hardship of eviction on elderly low-income tenants is self-evident. Defendants, in contrast, will only suffer hardship if they refuse to execute HAP contracts with Oakland Housing Authority; otherwise, they are guaranteed rents that are "reasonable in comparison with rents charged for comparable dwelling units in the private, unassisted local market." 42 U.S.C. § 1437f(o)(10)(A). In light of the district court's observation that Defendants "could identify no specific terms in the HAP contract which were objectionable," the court did not abuse its discretion in balancing the parties' relative hardships. Nor was the court's conclusion that the public interest favored entry of the preliminary injunction an abuse of discretion. "[I]t is obvious that compliance with the law is in the public interest." *N.D. v. Haw. Dep't of Educ.*, 600 F.3d 1104, 1113 (9th Cir. 2010).

In sum, the district court did not abuse its discretion by entering an injunction preventing Defendants from evicting Plaintiffs for paying their pre-lawsuit Section 8 contribution, or from charging Plaintiffs an increased rent without accepting enhanced vouchers.

## 2. Mandatory Injunction

**[9]** The district court erred, however, when it required Defendants to execute HAP contracts with the Oakland Hous-

ing Authority. The court incorrectly inverted the burden of proof by examining whether the proposed injunction would cause irreparable harm to *Defendants*. The court wrote: "Since Defendant could identify no specific terms in the HAP contract which were objectionable, the Court finds unpersuasive his asserted irreparable injury from being required to comply with the law and enter into HAP contracts with the Oakland Housing Authority." This conclusion fails to recognize that those seeking injunctive relief, not those opposing that relief, are responsible for showing irreparable injury. *See Winter v. NRDC, Inc.*, 129 S. Ct. 365, 374 (2008). By examining the legally irrelevant question of whether Defendants were likely to suffer harm if they were ordered to execute HAP contracts with the Oakland Housing Authority, the district court failed to make the essential finding that Plaintiffs are likely to suffer irreparable harm unless Defendants are ordered to enter HAP contracts with the Oakland Housing Authority.

The district court's oversight is legally significant for three related reasons. First, the person or entity seeking injunctive relief must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Id.* at 375. An injunction will not issue if the person or entity seeking injunctive relief shows a mere "possibility of some remote future injury," *id.* (internal quotation marks omitted), or a "conjectural or hypothetical" injury, *City of L.A. v. Lyons*, 461 U.S. 95, 102, 106 n.7 (1983). Second, "[i]njunctive relief . . . must be tailored to remedy the *specific harm alleged*. An overb[roa]d injunction is an abuse of discretion." *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991) (emphasis added) (citations omitted). Third and finally, "[a] mandatory injunction . . . is particularly disfavored. In general, mandatory injunctions are not granted unless extreme or very serious damage will result[,] and are not issued in doubtful cases." *Marlyn Nutraceuticals*, 571 F.3d at 879 (citations and internal quotation marks omitted).

**[10]** By requiring Defendants to enter a HAP contract with the Oakland Housing Authority, the district court's injunction violates all three of these principles governing injunctive relief. First, Plaintiffs have not made *any* showing that they are likely to be harmed by the Defendants' failure to enter HAP contracts. Absent such evidence of Plaintiffs' likely injuries, Plaintiffs have satisfied neither the baseline *Winter* standard nor the heightened standard we have adopted with respect to mandatory injunctions. *See, e.g.*, *Marlyn Nutraceuticals*, 571 F.3d at 879-80 (vacating mandatory injunction where record failed to establish harm). In addition, absent any harm relating to the HAP contracts, the district court's injunction is overbroad because it is not tailored to remedy the Plaintiffs' actual harms, which are limited entirely to Defendants' threats of *eviction*, not Defendants' threats to refuse enhanced vouchers. *See, e.g.*, *United States v. BNS Inc.*, 858 F.2d 456, 466 (9th Cir. 1988) (modifying injunction to reduce hardship to defendant while continuing to "eliminate the harm . . . at issue in the [plaintiff's] . . . complaint").

We disagree with our dissenting colleague's conclusion that the injunction is appropriate because the plaintiffs' statutory "right to remain" necessarily includes an implied statutory right to "adequate heat and hot water, lighting, air quality, sanitary conditions, and building security." Dissent at 2930-31. As our colleague correctly acknowledges, "[t]he statute nowhere explicitly requires an owner to enter into a HAP contract." *Id.* Moreover, the sections of the statute on which he relies as the conceptual underpinning for his view of implied rights by definition speak only to the time period when the owner has not yet lawfully opted out of the Section 8 program—a time when a HAP contract is clearly required. *See id.* The Dissent doesn't say so, but since he is conjuring up out of whole cloth the costly implied rights he finds, those implied rights could be significantly expanded by the PHA (all in the name of furthering its mission) to render essentially worthless an owner's right to lawfully opt-out of its involvement in the Section 8 program (subject to certain tenants'

right to remain in the Apartments, as provided *supra*). Such uncabined, implied rights could also frustrate Congress's clear intention in the 1996 amendments to the Act to end so-called "endless leases," under which owners could not refuse to renew the leases of Section 8 tenants at the conclusion of a lease term, except as otherwise provided in 42 U.S.C. § 1437f(d)(1)(B)(ii) (repealed 1996), and the "take one, take all" provisions of 42 U.S.C. § 1437f(t)(1)(A) (repealed 1996), which effectively provided that "once a landlord [had chosen] to participate by accepting a Section 8 tenant, it [could] not turn away subsequent Section 8 certificate holders based on their status as Section 8 participants." *Salute v. Stratford Greens*, 918 F. Supp 660, 663 (E.D.N.Y. 1996), *aff'd sub nom. Salute v. Stratford Greens Garden Apartments*, 136 F. 3d 293 (2d Cir. 1998); *see also Salute v. Stratford Greens Garden Apartments*, 136 F. 3d at 300 (noting that repeal of these provisions reflects a clear "congressional intent that the burdens of Section 8 participation are substantial enough that participation should not be forced on landlords").

If Congress had intended that owners must continue to execute HAP contracts despite opting out of Section 8, it could easily have said so. Instead, Congress was silent on the issue. Rather than inferring from this silence an obligation on the part of opting-out owners to enter HAP contracts, the more logical inference (particularly in light of the opt-out provision and the 1996 amendments to the Act) is that building owners are free to opt out of Section 8 so long as they respect the eligible tenants' statutory right to remain. If owners are willing to forego significant rental income in order to avoid the obligations imposed by HAP contracts, they are free to do so. If owners prefer to receive a fair market rent via enhanced vouchers, they must also execute an HAP contract. But unless and until Congress fills in the gaps in its statutory scheme, we are unwilling to adopt the sweeping conclusion endorsed by the Dissent and require Defendants to enter HAP contracts. Indeed, we do not even know what HAP terms the PHA proposed for the Defendants in this case because the record

before us does not include a copy. We cannot fathom that Congress intended *sub silentio* to require Section 8 opt-outs to enter contracts of adhesion whose terms are dictated solely by PHAs but whose financial burdens can easily frustrate other provisions of the Act.

Even if we agreed with the Dissent's legal premise that the statutory "right to remain" includes an implied statutory right to certain housing conditions (which we do not), we would still be compelled to conclude that the district court abused its discretion. "The essence of equity jurisdiction is the power of the court to fashion a remedy depending upon *the necessities of the particular case.*" *United States v. Odessa Union Warehouse Co-op*, 833 F.2d 172, 175 (9th Cir. 1987) (emphasis added). Under our case-specific approach, "we do not presume irreparable harm" simply because a defendant violates a statute that authorizes injunctive relief. *See Small ex rel. NLRB v. Operative Plasterers' & Cement Masons' Int'l Ass'n Local 200*, 611 F.3d 483, 494 (9th Cir. 2010) (rejecting, in light of *Winter*, our prior holding that "once a likelihood of success is established, district courts are required to 'presume irreparable injury' " in statutory enforcement actions (quoting *Miller ex rel. NLRB v. Cal. Pac. Med. Ctr.*, 19 F.3d 449, 460 (9th Cir. 1994) (en banc))); *cf. Mac's Shell Serv., Inc. v. Shell Oil*, 130 S. Ct. 1251, 1263 & n.12 (2010) (discussing 15 U.S.C. § 2805(b)(2)(A)(ii), a statute that "substantially relaxes the normal standard for obtaining preliminary-injunctive relief"). Rather, we must determine whether, "[o]n the facts of this case," an injunction is warranted. *Winter*, 129 S. Ct. at 375.

On the record before us, it is entirely speculative for the Dissent to conclude that Defendants are likely to violate "HUD's housing quality standards" in the absence of adequate economic incentives to do so. The Dissent "assume[s] that Defendants are not trying to commit economic suicide," and further assumes that Defendants will only be able to stay in business if they drastically reduce the services and housing

standards provided to Plaintiffs. Dissent at 2932. These assumptions wholly lack evidentiary support, and rest on the untenable premise that Defendants are willing to risk the imposition of significant penalties under state law by providing substandard housing conditions. *See* Cal. Civ. Code § 1942.4(b)-(c) (requiring landlords who violate housing standards to abate the harmful conditions and pay actual damages, statutory damages, attorney's fees). We disagree with the Dissent that these results are *likely*, and that, even if these results *were* likely, the proper remedy would be to compel Defendants to enter HAP contracts with the Oakland Housing Authority. Instead, if the Dissent were correct (which we believe he is not) that the statutory "right to remain" requires landlords to provide certain housing conditions, the appropriate remedy would be to order landlords to provide those housing conditions, not to require them to enter into HAP contracts with local housing authorities. Thus, even under the Dissent's construction of the statute, the district court's injunction is not properly tailored to remedy the speculative harms discussed by the Dissent.

**[11]** Because Plaintiffs must show a *likelihood*, not a mere *possibility*, of irreparable injury, *see Winter*, 129 S. Ct. at 374-75, and because Plaintiffs have made no such showing, the district court abused its discretion by issuing an overbroad mandatory injunction that failed to "identif[y] and appl[y] the correct legal rule." *United States v. Hinkson*, 585 F.3d 1247, 1263 (9th Cir. 2009) (en banc).

## CONCLUSION

We hold that § 1437f(t) provides tenants a right to remain in their previously subsidized Section 8 rental units in the absence of just cause for eviction, and that tenants with enhanced vouchers cannot be required to pay more than their portion of the rent as defined by the Section 8 statute and applicable regulations. The district court correctly applied the *Winter* test to Plaintiffs' request for preliminary prohibitory

relief, and we accordingly affirm Sections V.A and V.B of the district court's preliminary injunction.

We also hold, however, that the district court abused its discretion by issuing a mandatory injunction requiring Defendants to enter into contracts with the local housing authority. There is no evidence in the record that Plaintiffs are likely to suffer harm if Defendants refuse to enter such contracts; instead, Plaintiffs' only alleged harms are adequately remedied by the prohibitory portions of the injunction. Accordingly, we vacate Section V.C of the district court's preliminary injunction, and remand for further proceedings consistent with this opinion.

Costs are awarded to Plaintiffs.

**AFFIRMED IN PART, VACATED IN PART, AND REMANDED.**

---

W. FLETCHER, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority that 42 U.S.C. § 1437f(t) confers on tenants the right to remain in their homes and precludes owners from charging tenants more in rent than the contribution prescribed by the Section 8 statute and applicable regulations. I therefore concur in those portions of the majority's opinion so holding.

I respectfully dissent from the majority's holding that Defendants have no obligation to enter into HAP contracts with the local public housing authority ("PHA"). The majority's discussion of the appropriateness of injunctive relief is a red herring. The critical issue is whether the Defendants have an obligation to enter into those contracts, irrespective of how that obligation is enforced. The majority holds that Defen-

dants have no obligation to enter into HAP contracts. I would hold that they do have such an obligation.

The majority holds, correctly, that § 1437f(t) gives Section 8 tenants a "right to remain" in their subsidized apartments after the transition to the enhanced voucher program. But the majority fails to recognize the extent of that right. Under the enhanced voucher program, Defendants have the right to raise the total rent on apartments to fair market value. In return, tenants have the right to remain in their apartments. The tenants' right to remain is a practical, common-sense right. It is a statutory right to remain in their apartments while paying the same amount of out-of-pocket rent as before. The enhanced vouchers implement this part of the right. It is also a statutory right to remain in their apartments while enjoying the same level of maintenance and service as before. The HAP contracts implement this part of the right.

Section § 1437f(t) was enacted to protect the "particularly vulnerable populations" of low-income, elderly, and disabled persons who occupy former Section 8 projects. *See Estevez v. Cosmopolitan Assocs.*, No. 05-4318, 2005 WL 3164146, at *5 (E.D.N.Y. Nov. 28, 2005) (quoting *Section 8 Housing: Hearing before the Subcomm. on Hous. & Transp. of the S. Banking Comm.*, 106th Cong. (1999) (written testimony of Rep. Rick Lazio)). HAP contracts play a central role in the statutory scheme. HAP contracts prescribe, and enable PHAs to enforce, the conditions of public housing that Congress thought essential to the statutory purpose of providing the poor not only an affordable but also "a decent place to live." § 1437f(a). *See also id.* § 1437(a)(1)(A) ("It is the policy of the United States . . . to assist States and political subdivisions of States to remedy the unsafe housing conditions and the acute shortage of decent and safe dwellings for low-income families . . . ."). By countenancing enhanced voucher tenancies in the absence of a HAP contract, the majority creates a situation never contemplated by Congress.

Owners who do not enter into HAP contracts cannot redeem enhanced vouchers. *See* 24 C.F.R. § 982.305(c)(2); Guide at 11-3B. HUD regulations treat housing assistance payments and HAP contracts as symbiotic. *See id.* § 982.309(b)(2)(iii) ("The HAP contract terminates if . . . the PHA terminates assistance for the family."); *id.* § 982.311(c)(2) ("Housing assistance payments terminate if . . . the HAP contract terminates."). Those courts that have held that § 1437f(t)(1)(B) creates a right to remain using enhanced vouchers have therefore also required the execution of HAP contracts so that tenants may apply enhanced vouchers to pay their increased rents. *See, e.g.*, *Feemster v. BSA Ltd. P'ship*, 548 F.3d 1063, 1069 (D.C. Cir. 2008), *aff'g in relevant part*, 471 F. Supp. 2d 87, 92, 97 (D.D.C. 2007); *Barrientos v. 1801-1825 Morton, LLC*, No. 06-6437, 2007 WL 7213974, at *6 (C.D. Cal. Sept. 11, 2007), *aff'd on other grounds*, 583 F.3d 1197 (9th Cir. 2009); *Jeanty v. Shore Terrace Realty Ass'n*, No. 03-8669, 2004 WL 1794496, at *3 (S.D.N.Y. Aug. 10, 2004). *But see Estevez*, 2005 WL 3164146, at *7 (stating, in dicta, that owner who agrees to accept as full payment of rent a tenant's statutorily prescribed contribution, thereby forgoing any money from enhanced vouchers, "remains free to refuse to sign contracts with [the PHA] and thereby to forfeit any rental income above and beyond the direct payments made by tenants").

The text of the Section 8 statute nowhere explicitly requires an owner to enter into a HAP contract, but the statute clearly contemplates that the owner will do so. *See, e.g.*, § 1437f(c)-(d) (required terms of HAP contract); 1437f(o)(7) (required terms of owner-tenant lease governed by HAP contract); 1437f(o)(8)(A) (inspection of units covered by HAP contract for compliance with HUD's housing quality standards). A HAP contract does more than merely to authorize tenants to use enhanced vouchers to satisfy part of their rent obligations, and to authorize owners to redeem those vouchers. HAP contracts prescribe minimum housing quality standards, requiring owners to provide such things as adequate heat and hot water,

lighting, air quality, sanitary conditions, and building security. 42 U.S.C. § 1437f(o)(8)(B); 24 C.F.R. § 982.401. They protect tenants who are the victims of domestic violence from being evicted for that reason. 42 U.S.C. § 1437f(d)(1)(B)(ii), (o)(7)(C). HAP contracts also give owners and law enforcement officers latitude to make housing projects safer places. They allow owners to evict occupants for drug-related or criminal activity that threatens the health and security of other tenants and require that law enforcement officers be provided access to common areas if they have probable cause to believe criminal activity is occurring there. *See* § 1437f(d)(1)(B)(iii), (d)(6), (o)(7)(D).

Recognizing that low-income tenants might lack the ability to assert their right to "a decent place to live" against owners, Congress made PHAs responsible for enforcing compliance with HAP contracts. The statutory structure thus assigns HAP contracts a dual role: they prescribe liveable conditions for housing projects, and they enable PHAs to enforce compliance with those conditions. *See, e.g.*, 42 U.S.C. § 1437f(o)(8)(A), (C)-(D); 24 C.F.R. § 982.405 (PHA inspections to ensure compliance with housing quality standards); *id.* § 982.404(a)(2) (PHA required to take "prompt and vigorous action" to enforce housing quality standards; PHA remedies for noncompliance include suspension or reduction of housing assistance payments and termination of HAP contract); *id.* § 982.453(b) (PHA remedies for any breach of HAP contract include reduction or termination of housing assistance payments and termination of HAP contract).

No owner would participate in the Section 8 program unless he could collect rent, and no owner could collect anything close to the amount of rent to which he is entitled unless he also entered a HAP contract. Hence the strangeness of Defendants' argument.

By proposing to forgo enhanced voucher payments, Defendants propose to incur a substantial financial loss. The fifteen

individual plaintiffs in this suit allege in their complaint that they pay between $159.00 and $550.00 per month in rent out of their own pockets, for a total of about $5,000 monthly or $60,000 annually. HUD has set the fair market rent for a one-bedroom apartment in Oakland much higher, at $1,176 per month. *See* Final Fair Market Rents for Fiscal Year 2011 for the Housing Choice Voucher Program and Moderate Rehabilitation Single Room Occupancy Program, 75 Fed. Reg. 61254, 61263 (Oct. 4, 2010). *See also* 42 U.S.C. § 1437f(c)(1)(B); 24 C.F.R. §§ 888.113, 982.503. Fair market rent for fifteen one-bedroom apartments thus totals $17,640 monthly or $211,680 annually. Defendants would leave approximately $150,000 in annual rental income on the table by declining to enter the HAP contracts covering the plaintiffs in this case. The true figure at stake may be much greater because defendants would forgo enhanced voucher payments from all of the Park Village tenants under the program, not just the individual plaintiffs in this suit.

I assume that Defendants are not trying to commit economic suicide. If that is so, they must somehow compensate for this loss of income. They may do so by failing to maintain and service plaintiffs' living units in compliance with HUD's housing quality standards. They may also seek to recoup some of their loss by renewing their efforts to empty Park Village of its population of elderly, fixed-income Section 8 tenants. Only such cost-saving measures action make any economic sense, especially because, as the district court observed, defendants "could identify no specific terms in the HAP contract which were objectionable."

There is thus a significant likelihood that if owners escape the obligation to enter into HAP contracts by refusing to accept enhanced vouchers, they will take steps to defeat the tenants' right to remain. Without the ability to insist that the Defendants provide "a decent place to live," the "right to remain" guaranteed by § 1437f(t) would become illusory.