PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 16-2692
_____


THEODORE HAYES;
AQEELA FOGLE,
Appellants

v.

PHILIP E. HARVEY
_____


On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(E.D. Pa. No. 2-15-cv-02617)
District Judge:  Honorable Nitza I. Quiñones Alejandro
_____


Argued January 18, 2017

Before:  FISHER,[*] HARDIMAN, and GREENAWAY, JR.,
*Circuit Judges*.


(Filed: October 18, 2017)

Michael Donahue, Esq.
Rachel Garland, Esq. [ARGUED]
George D. Gould, Esq.
Community Legal Services
1424 Chestnut Street
Philadelphia, PA 19102
        *Counsel for Appellants*


Susanna Randazzo, Esq.  [ARGUED]
Kolber & Randazzo
One South Broad Street, Suite 1610
Philadelphia, PA 19107
        *Counsel for Appellee*


James R. Grow, Esq.
National Housing Law Project
703 Market Street, Suite 2000
San Francisco, CA 94103
        *Counsel for Amicus Curiae*

---

[*] Honorable D. Michael Fisher, United States Circuit Judge for the Third Circuit, assumed senior status on February 1, 2017.

2

———

OPINION OF THE COURT

———

FISHER, *Circuit Judge*.

In this appeal, we must decide whether the enhanced voucher provision of the United States Housing Act of 1937, 42 U.S.C. § 1437f(t), requires property owners to continuously renew enhanced-voucher tenancies. Theodore Hayes and Aqeela Fogle (the Hayes family) are a low-income family whose rent is subsidized by enhanced voucher assistance. Their eligibility to receive enhanced vouchers is contingent upon their continued tenancy in a unit currently owned by Philip E. Harvey. Toward the end of their most recent lease term, Harvey notified the Hayes family that he would not renew their lease. The Hayes family refused to vacate the premises, arguing that as enhanced-voucher tenants, they have an enforceable "right to remain" in their unit as long as it is offered for rental housing. The District Court disagreed and granted Harvey's motion for summary judgment. Because we conclude that the enhanced voucher provision does not obligate property owners to renew enhanced-voucher tenancies after the initial lease term, we will affirm.

## I.     Background

### A.     Statutory Background

Since 1974, the federal government has provided rental assistance to low-income families through section 8 of the Housing Act, 42 U.S.C. § 1437f. Congress enacted section 8

with the express purpose of "aiding low-income families in obtaining a decent place to live and of promoting economically mixed housing." § 1437f(a). "[A] key means to that end is the creation of incentives for private owners to participate in the section 8 program." *Barrientos v. 1801-1825 Morton LLC*, 583 F.3d 1197, 1203 (9th Cir. 2009).

Section 8 assistance is funded by the U.S. Department of Housing and Urban Development (HUD) and administered by local public housing agencies. 24 C.F.R. § 982.1(b)(1). Those agencies enter into Housing Assistance Payment (HAP) contracts with participating property owners. HAP contracts generally require that a lease between a property owner and tenant cover at least one year. 42 U.S.C. § 1437f(d)(1)(B)(i), (o)(7)(A). They also prohibit the property owner from "terminat[ing] the tenancy [during the term of the lease] except for serious or repeated violation of the terms and conditions of the lease, for violation of applicable Federal, State, or local law, or for other good cause." § 1437f(d)(1)(B)(ii), (o)(7)(C). Importantly, HAP contracts establish the maximum monthly rent a property owner may charge for each dwelling unit. § 1437f(c)(1)(A). A tenant's assistance is statutorily determined based on his or her household income, the unit's rent, and the rent for similar units in the market area (known as the payment standard). § 1437f(c)(3), (o)(2).

There are two distinct assistance programs: project-based assistance and tenant-based assistance (or the Housing Choice Voucher program). Project-based assistance is provided directly to property owners—the subsidies are property-specific. Tenant-based assistance is provided directly to tenants—the subsidies are tenant-specific.

In the 1990s property owners became eligible to opt out of project-based assistance programs. Congress and HUD

4

sought to minimize tenant displacement, while also continuing to encourage property owner participation in section 8 programs. *See Barrientos*, 583 F.3d at 1203-05. So Congress enacted a notice requirement that prohibits a property owner from increasing rent or evicting tenants until he or she provides one year of written notice to HUD and the residing tenants that the HAP contract for project-based assistance will not be renewed. *See* § 1437f(c)(8). And the notice must inform tenants that "in the event of termination [HUD] will provide tenant-based rental assistance to all eligible residents, enabling them to choose the place they wish to rent, which is likely to include the dwelling unit in which they currently reside." § 1437f(c)(8)(A).

But an ordinary voucher under tenant-based assistance does not cover a tenant's rent to the extent that it exceeds the applicable payment standard. § 1437f(o)(2)(B). And following a valid opt-out, property owners are no longer subject to limitations on what they may charge for rent. So to enable residents to "choose" to continue renting the "dwelling unit in which they currently reside," § 1437f(c)(8)(A), Congress also enacted a new type of tenant-based assistance: enhanced voucher assistance, § 1437f(t).

Although it is a type of tenant-based assistance, enhanced voucher assistance has elements of both project-based and tenant-based assistance. Like tenant-based assistance, enhanced voucher assistance is tenant-specific and participating tenants are required to contribute a statutorily determined portion of their income. *Compare* § 1437f(o)(2) (ordinary voucher assistance), *with* § 1437f(t)(1) (enhanced voucher assistance). Like project-based assistance, enhanced voucher assistance is property-specific. § 1437f(t)(1)(B). Tenants are eligible to receive enhanced voucher assistance during any period in which they remain in the property they

5

resided in on the date of the property owner's opt-out from a project-based program (the "eligibility event"). § 1437f(t)(2). Should the tenant move or make the voucher available to another family, his or her assistance converts to ordinary tenant-based assistance. § 1473f(t)(1)(C).

The primary "enhancement" of the assistance is that an enhanced voucher covers the difference between the tenant's contribution and the rent, even if the rent exceeds 110 percent of the fair market rent for similar units in the area. *See* §1437f(t)(1)(B). In other words, enhanced voucher assistance is not limited by a payment standard.

## B.     Factual Background

In 1982, Florence Hayes and her family moved into 538B Pine Street, Philadelphia, Pennsylvania—a four-bedroom unit in a duplex owned by Pine Street Associates. Pine Street Associates entered into a HAP contract with the Philadelphia Housing Authority (PHA), which provided rental assistance under a project-based program for its tenants, including the Hayes family.

On January 9, 2008, Pine Street Associates notified HUD and the Hayes family that when its HAP contract expired on January 17, 2009, it would not be renewed. Accordingly, on January 17, 2009, the Hayes family's assistance converted from project-based to tenant-based. The Hayes family elected to remain and chose to do so with enhanced voucher assistance.

Later that year, Pine Street Associates sold 538 Pine Street free and clear of any impediments, encumbrances, liens, or restrictions, to Philip E. Harvey. Harvey entered into a HAP contract with the PHA and a related lease with the Hayes family, agreeing to accept enhanced vouchers toward their rental obligations. The HAP contract set the maximum rent for the unit at $2,400 per month, exceeding the applicable payment

6

standard of $1,546 per month by $854. While under the ordinary voucher provision the Hayes family would have to cover the rent to the extent that it exceeded $1,546, because they were eligible for enhanced voucher assistance, the PHA covered the $854 difference. The lease had an initial termination date of April 30, 2011, subject to automatic renewal for another one-year term.

In February 2015, Florence Hayes passed away and Theodore Hayes (Florence Hayes's son) was processed as head of household. Soon after, Harvey notified the PHA and Theodore Hayes that he would not renew the HAP contract or the Hayes family's lease upon the natural expiration of the lease term, citing Florence Hayes's passing and his desire to renovate and have his daughter live in the unit. And on May 1, 2015, when that lease term expired, Harvey sent a notice to vacate.

C.    Procedural History

The Hayes family responded to the notice to vacate by filing a complaint in the District Court seeking declaratory relief and an order enjoining Harvey from initiating eviction proceedings. They argued in the District Court, and maintain on appeal, that the Housing Act's enhanced voucher provision, 42 U.S.C. § 1437f(t), creates an enforceable right to remain in their unit. Alternatively, they argued that if Harvey may terminate their tenancy, he may only do so for "cause," and his stated reasons do not constitute good cause. Harvey responded that because he never participated in a project-based program, he is bound only by the terms of the HAP contract and related lease and not subject to any additional requirements imposed by section 8. The parties filed cross motions for summary judgment. The District Court granted summary judgment in favor of Harvey, denied the Hayes family's motion for

7

summary judgment, and denied their motion for a preliminary injunction as moot. 186 F. Supp. 3d 427 (E.D. Pa. 2016). The court concluded that while Harvey was subject to the terms of section 8, the enhanced voucher provision did not provide the Hayes family an "unfettered and perpetual right to remain," and so Harvey was not precluded from termination. *Id.* at 433–34. The Hayes family appealed and, pending this appeal, the District Court granted an injunction preventing Harvey from evicting the Hayes family.

## II.     Jurisdiction and Standard of Review

The District Court had jurisdiction under 28 U.S.C. § 1331. During the pendency of this appeal, Theodore Hayes moved out of the premises and the PHA processed Aqeela Fogle (Theodore Hayes's niece) as the head of household. Under Article III of the Constitution, our "exercise of judicial power depends upon the existence of a case or controversy." *Rendell v. Rumsfeld*, 484 F.3d 236, 240 (3d Cir. 2007) (quoting *Intn'l Bhd. of Boilermakers v. Kelly*, 815 F.2d 912, 914 (3d Cir. 1987)). "Article III demands that an actual controversy persist throughout all stages of litigation." *Hollingsworth v. Perry*, 133 S. Ct. 2652, 2661 (2013) (internal quotation marks omitted). When evaluating mootness we ask "whether changes in circumstances that prevailed at the beginning of the litigation have forestalled any occasion for meaningful relief." *Rendell*, 484 F.3d at 240 (internal quotation marks omitted). Because Theodore Hayes no longer resides in the unit, he does not have a personal stake in the outcome of this suit and we do not have jurisdiction to hear his claims. However, since Fogle still resides in the unit and, until she moves, is eligible for enhanced voucher assistance, there remains an occasion for meaningful relief. Thus, we are satisfied that the case remains a justiciable controversy under Article III.

8

Our jurisdiction exists under 28 U.S.C. § 1291. Our review of the District Court's order granting summary judgment is *de novo*. *Massie v. U.S. Dept. of Hous. & Urban Dev.*, 620 F.3d 340, 347 (3d Cir. 2010). We will affirm if, viewing the evidence in the light most favorable to the nonmoving party, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## III. Discussion

The Hayes family argues that, as enhanced-voucher tenants, they have a right to remain in unit 538B because they have not moved since the unit was converted from project-based to tenant-based assistance, they have not provided the voucher to another family, the property continues to be offered as rental housing, and Harvey does not have cause to terminate their tenancy. Unless and until any of the above circumstances change, they assert Harvey must continually renew their lease. Harvey, on the other hand, argues that because he purchased the property "free and clear," he is not subject to section 8's terms and conditions and is under no obligation to renew their lease. We conclude that the manner in which Harvey purchased the property is not dispositive. Harvey's rights and duties under the section 8 program are set forth in the HAP contract and

9

related lease.[1] However, for the reasons that follow, we conclude that federal law does not impose on property owners a requirement of cause to terminate enhanced-voucher tenancies through nonrenewal.

---

[1] It is the existence of the HAP contract and related lease that subject Harvey to section 8. *See Powell v. Hous. Auth. of City of Pittsburgh*, 812 A.2d 1201, 1203 (Pa. 2002) (explaining that if the "PHA approves the tenancy, the PHA and the owner enter into a [HAP] contract . . . under which the PHA makes rental payments to subsidize occupancy," and, in turn, "the owner and the now-Section 8 participant enter into a lease for the subsidized unit"); *see also U.S. ex rel. Richards v. R & T Investments LLC*, 29 F. Supp. 3d 553, 562 (W.D. Pa. 2014) (stating that an owner "must enter into" a HAP contract "[t]o receive assistance payments"). The dissent states "other courts have held that the enhanced voucher statute can impose requirements even on landlords who are not covered by a HAP contract." Dissenting Op. at 2 n.1 (citing *Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr.*, 636 F.3d 1150, 1161–62 (9th Cir. 2011)). The section of *Park Village* cited for this proposition, however, pertains to whether the District Court erred in granting a mandatory injunction requiring an owner to *enter* into a HAP contract, "despite opting out of Section 8." *Park Vill.*, 636 F.3d at 1161. There, the Ninth Circuit held that an owner was free to execute a HAP contract if he so chose; if he did, he was entitled to "fair market rent via enhanced vouchers," but if not, he would forgo "significant rental income," while avoiding obligations imposed by HAP contracts. *Id.* at 1161–62. Here, it is evident that the rights and duties under section 8 are set forth in the HAP contract and related lease.

This appeal presents an issue of statutory interpretation, so we start with an examination of the statute's plain language. *See Rosenberg v. XM Ventures*, 274 F.3d 137, 141 (3d Cir. 2001). If the statutory language is unambiguous, and the "literal application of the statute" will not "produce a result [either] demonstrably at odds with the intentions of its drafters" or "so bizarre that Congress could not have intended it," we need not consider the statutory purpose or legislative history. *Doe v. Hesketh*, 828 F.3d 159, 167 (3d Cir. 2016) (internal quotation marks omitted).

A.      The Opt-out Provision

We begin with section 8 of the Housing Act, 42 U.S.C § 1437f, because the Hayes family initially received project-based assistance to rent unit 538B from Pine Street Associates. Since Pine Street Associates opted out of a project-based program, we look to the Housing Act's opt-out provision, § 1437f(c)(8).[2] In addition to imposing specific obligations on HUD and the property owner, the opt-out provision clearly contemplates the property owner having a right to terminate an assisted tenancy at some point following a valid opt-out from

---

[2] Although the opt-out provision governs tenants' rights *before* an enhanced voucher is provided and therefore does not govern this case, given "the fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme," *Util. Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427, 2441 (2014) (internal quotation marks omitted), we will walk through all of the relevant statutory provisions. Our dissenting colleague sidesteps this basic principle by homing in on the statute's "may elect to remain" language in isolation from its place in the Housing Act's overall scheme.

11

a project-based program.

First, subparagraph (A) makes clear that an opting out property owner must provide notice of his or her intention not to renew the HAP contract to HUD and to the affected tenants, and that following termination of the HAP contract, HUD will provide tenant-based assistance to the affected tenants. *See* § 1437f(c)(8)(A). Although the forthcoming tenant-based assistance provides affected tenants with the financial means to "choose the place they wish to rent, which is likely to include the dwelling unit in which they currently reside," nothing in § 1437f(c)(8)(A) obligates the property owner to renew expired leases. Second, subparagraph (B) provides, "the owner may not evict the tenants or increase the tenants' rent payment until such time as the owner has provided the notice [of opt-out] and 1 year has elapsed." § 1437f(c)(8)(B). But it is silent on a property owner's termination rights following that notice period.

The parties do not dispute both that Pine Street Associates satisfied its obligations under the opt-out provision and that the Hayes family's assistance converted to tenant-based assistance. Because termination of a HAP contract for project-based assistance is a qualifying "eligibility event" for enhanced voucher assistance, *see* § 1437f(t)(2), we look next to § 1437f(t), the enhanced voucher provision.

B.      The Enhanced Voucher Provision

The enhanced voucher provision first states that unless explicitly provided for in 42 U.S.C § 1437f(t)(1)(A)-(D), "[e]nhanced voucher assistance . . . shall be voucher assistance under subsection (o)." § 1437f(t)(1). The threshold question is therefore whether § 1437f(t)(1) limits property owners' nonrenewal rights. If it does not, we look to nonrenewal under the ordinary voucher's termination provision, §

12

1437f(o)(7)(C). We note at the outset that nothing in the enhanced voucher provision explicitly speaks to termination generally, much less to termination in the context of nonrenewal.

It is undisputed that subparagraphs (A) and (D) do not limit property owners' nonrenewal rights. They provide that an assisted family "shall pay as rent no less than the amount the family was paying on the date of the eligibility event," § 1437f(t)(1)(A), unless the family's income "declines to a significant extent," § 1437f(t)(1)(D).

The parties dispute whether subparagraph (B) creates a right to remain, and if it does, whether and to what extent that right is enforceable against property owners. They also dispute whether subparagraph (C) exhausts the ways that an assisted family loses its eligibility to receive enhanced voucher assistance.

Subparagraph (B) speaks to HUD's obligation to provide the assisted family with the financial means to remain in the event that the family elects to do so. It states in relevant part:

> [T]he assisted family may elect to remain in the same project in which the family was residing on the date of the eligibility event for the project, and if, during any period the family makes such an election and continues to so reside, the rent for the dwelling unit of the family in such project exceeds the applicable payment standard established pursuant to subsection (o) of this section for the unit, the

> amount of rental assistance provided on behalf of the family shall be determined using a payment standard that is equal to the rent for the dwelling unit (as such rent may be increased from time-to-time) . . . .

§ 1437f(t)(1)(B). The language "the assisted family may elect to remain" plainly does not limit property owners' nonrenewal rights. Our dissenting colleague, however, suggests that it does, because "extending this right to a tenant necessarily limits the rights of a landlord: if a statute guarantees tenants hot water, it also limits a property owner's right *not* to install hot water plumbing." Dissenting Op. at 4. This analogy is inapt. The statute does not guarantee the tenant an unconditional right to remain at the property. Rather, it guarantees the tenant the financial support necessary to pay a higher rent if the lease is renewed. Nowhere does the statute require the landlord to renew the tenant's lease indefinitely.

We recognize that a "statute should be construed to give effect to all its provisions, so that no part will be inoperative or superfluous, void or insignificant," *Corley v. United States*, 556 U.S. 303, 314 (2009), that § 1437f(c)(8)(A) already provides a right to remain during the year following a property owner's notice of opt-out from a project-based program, and that § 524(d) of the Multifamily Assisted Housing Reform and Affordability Act of 1997, Pub. L. No. 105-65, tit. V, subtit. A, 111 Stat. 1344, 1408–09 (codified as amended at 42 U.S.C. § 1437f note), already obligates HUD to provide enhanced vouchers to eligible families. Still, for the reasons that follow, we do not believe that declining to require property owners to continuously renew enhanced-voucher tenancies renders the "may elect" language superfluous or otherwise meaningless.

14

We need not read past § 1437f(t)(1)(B)'s plain language to identify its role in the statutory scheme. Following the initial notice year, § 1437f(c)(8)(A) obligates HUD to provide assistance "enabling [the assisted family] to choose the place they wish to rent, which is likely to include the dwelling unit in which they currently reside." § 1437f(c)(8)(A). But if the post-opt-out rent for the "unit in which they currently reside" exceeds the payment standard under § 1437f(o)(1)(B), how can tenants be assured that HUD will meet its obligation under § 1437f(c)(8)(A)? Enter subparagraph (B) of the enhanced voucher provision, § 1437f(t)(1)(B). It obligates HUD to provide the assisted family with the financial means to remain after the notice period even if the required assistance exceeds the ordinary voucher's payment standard. The rent becomes its own unit-specific payment standard. Hence the term "enhanced voucher." In order for an assisted family to actually benefit from that assistance, § 1437f(t)(1)(B) necessarily requires that enhanced vouchers be credited toward their rental obligations. This ensures that, so long as the family remains eligible under § 1437f(t)(1)(C), they may exercise their election to remain without being required to pay more than their statutorily prescribed portion of the rent. It makes their election to remain meaningful.[3]

---

[3] Before the enactment of the current statutory language, § 1437f(t)(1)(B) provided that a family was entitled to an enhanced voucher "during any period that the assisted family continues residing in the same project." Pub. L. No. 106-74, tit. V, § 538(a), 113 Stat. 1047, 1122 (1999). But in 2000 Congress amended the provision to provide that "the assisted family may elect to remain . . . and if, during any period the family makes such an election and continues to so reside . . . ." Pub. L. No. 106-246, div. B, tit. II, § 2801, 114 Stat. 511, 569. The Hayes

15

We next turn to subparagraph (C), which states in relevant part:

> [S]ubparagraph (B) . . . shall not apply and the payment standard for the dwelling unit occupied by the family shall be determined in accordance with subsection (o) [the ordinary voucher provision] if—(i) the assisted family moves, at any time, from such project; or (ii) the voucher is made available for use by any family other than the original family on behalf of whom the voucher was provided .
> . . .

---

family and the dissent argue that the 2000 amendment is evidence that Congress intended to clarify that property owners have no say in the assisted family's election to remain. In our view, through the 2000 amendment Congress intended to make clear that, following a valid opt-out, HUD could not force an assisted family to leave the unit *and* that the family's enhanced vouchers must be credited toward their rental obligations. *See Park Vill.*, 636 F.3d at 1156 (finding that the statute "does not authorize owners to raise their rents to a reasonable market rate, but then to refuse to accept payment by means of an enhanced voucher, and evict an 'assisted family' for nonpayment of rent"). But after a rental agreement naturally expires, so too do the attendant rental obligations. At that point, the statute goes silent. Nothing in its text explicitly or impliedly obligates property owners to continuously renew enhanced-voucher tenancies.

§ 1437f(t)(1)(C). Essentially, if the assisted family moves or gives the voucher to another family, they lose eligibility to receive enhanced vouchers and their assistance converts to ordinary tenant-based assistance. The Hayes family argues that because § 1437f(t)(1)(C) does not include the loss of eligibility at the behest of the property owner, and Harvey's nonrenewal would trigger that loss by forcing them to move, he is obligated to continuously renew their lease. We disagree.

First, subparagraph (C) relates back to subparagraph (B), neither of which speaks to nonrenewal. Whereas subparagraph (B) affords an assisted family the right to receive "enhanced" financial assistance to be credited toward their rental obligations, subparagraph (C) relieves HUD of the financial obligation to provide such assistance if the family moves or provides the enhanced voucher to another family. The substance of these subparagraphs is primarily financial.

Second, to hold that § 1437f(t)(1)(C) is exhaustive of the specific ways in which an assisted family may lose eligibility for enhanced voucher assistance would subject property owners to a perpetual lease. This would be a significant departure from the ordinary voucher provision which does not, in any way, limit property owners' nonrenewal

17

rights.[4] *See* § 1437f(o)(7)(C). It would also make opt-out from project-based programs, under which property owners do have termination rights, *see* § 1437f(d)(1)(B), far less attractive. Such a result would likely discourage property owner participation in the first place, in turn frustrating realization of

---

[4] Our dissenting colleague suggests that the enhanced voucher provision is "by its very title, meant to be a departure from the ordinary voucher provision." Dissenting Op. at 8–9. On this point, we agree. But enhanced vouchers "depart[] from the ordinary voucher provision" in limited ways, none of which relate to termination. Furthermore, the dissent suggests that despite the "ostensibly shared purpose" between the enhanced and ordinary voucher statutes, there is "no reason to believe that . . . Congress intended these two statutes to be read as if they were one." *Id.* Again, we agree on this point—the majority does not read the provisions "as if they were one." It is undisputed, however, that these are provisions of the same statute, and there is no reason to believe that section 8's clear purpose does not extend to all of its provisions.

18

section 8's explicit purpose.[5] Had Congress intended to require property owners to continually renew enhanced-voucher tenancies, we are confident it would have said so clearly. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) (explaining that Congress does not "hide elephants in mouseholes" by "alter[ing] the fundamental details of a regulatory scheme in vague terms or ancillary provisions").

Our dissenting colleague believes that our interpretation of the enhanced voucher provision puts us at odds with other courts that have interpreted the statutory "right to remain." But he fails to adequately consider that the Ninth and D.C. Circuits concluded not that enhanced-voucher recipients have a right to remain both during and upon the natural expiration of their lease term, but specifically that a landlord who refuses to

---

[5] The dissent suggests, grounding its argument in what Congress "might . . . have perceived" or what it "might well have weighed," that because the "set of landlords affected [by the enhanced voucher provision] is small and, more importantly, relatively fixed . . . there is less need to encourage landlord participation" in the program. Dissenting Op. at 10–11. We disagree. We find no reason that Congress would encourage property owner participation in project-based programs to any lesser extent than it encourages participation in the voucher programs. Although by the time owners are actually affected by the enhanced voucher provision their numbers are "relatively fixed," an owner can today decide to participate in a project-based program, and later, to opt out. Thus, the number of prospective participants in project-based programs is not necessarily fixed. Encouraging participation in both assistance programs, in part by avoiding tying the hands of property owners upon the expiration of rental agreements, is required to realize section 8's explicit purpose.

accept enhanced vouchers as part of a tenant's rental payment cannot then evict those tenants for nonpayment. *See Park Vill.*, 636 F.3d at 1156 ("The statute gives 'assisted families' the right 'to remain in the same project.' The statute also authorizes owners to raise their rents to a reasonable market rate and to receive a housing assistance payment, by means of an enhanced voucher, to cover the authorized increases in rent. It does not authorize owners to raise their rents to a reasonable market rate, but then to refuse to accept payment by means of an enhanced voucher, and evict an 'assisted family' for nonpayment of rent."); *Feemster v. BSA L.P.*, 548 F.3d 1063, 1069 (D.C. Cir. 2008) ("Neither the U.S. Housing Act nor HUD's interpretation of that Act bars landlords from terminating a tenancy on any ground permitted by D.C. law. One thing that [the landlord] may not do, however, is refuse to accept payment by voucher and then contend that eviction is warranted for nonpayment of rent."). Our dissenting colleague further suggests that our interpretation of *Park Village*—where a midterm eviction for nonpayment was at issue—is flawed because we "conflate[] one of the Ninth Circuit's holdings with the other." Dissenting Op. at 21. The majority does not, however, "conflate" *Park Village*'s holdings. Rather, it agrees with the Ninth Circuit's interpretation regarding the "may elect to remain" language insofar as it lends meaning to the 2000 amendment—that tenants are only required to pay their "statutorily prescribed portion of the rent," and that owners cannot "refuse to accept payment by means of an enhanced voucher, and evict an 'assisted family' for nonpayment of rent." *Park Vill.*, 636 F.3d at 1156.

Here we are faced not with an eviction for nonpayment, as in *Park Village*, but with a nonrenewal of a naturally expired rental agreement. This is a meaningful distinction. It makes sense that a property owner who reaps the benefit of opting out

20

by increasing rent to market rate cannot then evict an assisted family who pays only their statutorily required portion of the rent—the family's *financial* ability to remain is the core of the enhanced voucher provision. But upon expiration of a HAP contract, the value and substance of an enhanced voucher is informed primarily by the family's rental agreement with the property owner. And nothing in the enhanced voucher provision, or elsewhere in the statute, explicitly or implicitly requires property owners to renew such agreements.[6]

We conclude that § 1437f(t)(1)(B) obligates HUD to provide "enhanced" financial assistance to be credited toward an assisted family's rental obligations during any period in which the family remains eligible under § 1437f(t)(1)(C), and that § 1437f(t)(1)(C) speaks only to the ways in which the family's conduct may relieve HUD of that financial obligation. Section 1437f(t) does not limit property owners' nonrenewal rights.

C.      The Termination Provision

---

[6] In fact, the Ninth Circuit found that requiring property owners to enter into HAP contracts could "render essentially worthless an owner's right to lawfully opt-out of its involvement in the Section 8 program" and "frustrate Congress's clear intention in the 1996 amendments to the Act to end so-called 'endless leases,' under which owners could not refuse to renew the leases of Section 8 tenants at the conclusion of a lease term." *Park Vill.*, 636 F.3d at 1161–62. The same reasoning applies here. Requiring property owners to continuously renew rental agreements would render their opt-out "essentially worthless."

21

Given § 1437f(t)'s silence as to property owners' nonrenewal rights, we look to § 1437f(o)'s termination provision, which states:

> *[D]uring the term of the lease*, the owner shall not terminate the tenancy except for serious or repeated violation of the terms and conditions of the lease, for violation of applicable Federal, State, or local law, or for other good cause . . . .

§ 1437f(o)(7)(C) (emphasis added). Under the plain language of § 1437f(o), Harvey's termination rights were limited only during the term of the Hayes family's lease.[7] Harvey did not seek a midterm eviction. He sought to terminate the Hayes family's tenancy upon the natural expiration of their lease term. Therefore, in order for us to find that the enhanced voucher provision precludes Harvey's termination through nonrenewal, we would need to apply the termination provision

---

[7] Before it was repealed in 1996, Congress did burden property owners upon the natural expiration of an ordinary voucher lease term in what was known as the "endless lease" provision. Pub. L. No. 104-134, tit. II, § 203(c)(2), 110 Stat. 1321, 1321–281 (1996). It stated "the owner shall not terminate the tenancy except for serious or repeated violation of the terms and conditions of the lease, for violation of applicable Federal, State, or local law, or for other good cause." 42 U.S.C. § 1437f(d)(1)(B)(ii) (1994) (repealed 1996).

in a way that departs from its application to the ordinary voucher provision.[8]

Through policy guidance, HUD has purported to extend § 1437f(o)(7)(C)'s midterm limitations to nonrenewals of enhanced-voucher tenancies:

> Tenants who receive an enhanced voucher have the right to remain in their units as long as the units are offered as rental housing. The tenant must have been issued an enhanced voucher sufficient to pay the rent charged for the unit, provided that the rent is reasonable. Owners may not terminate the tenancy of a tenant who exercises this right to remain except for cause under Federal, State or local law.
>
> . . . .
>
> This protection continues as long as the project is offered as rental housing, absent good cause to terminate tenancy under Federal, State or local law and provided the [public housing agency] continues to find the rent reasonable, Owners

_____

[8] The dissent concedes that enhanced-voucher tenants may be evicted for cause but offers no textual justification for imposing limits on nonrenewals of enhanced-voucher tenancies in the face of § 1437f(o)(7)(C)'s silence on the issue. *See* Dissenting Op. at 23 n.14.

23

> must continually renew the lease
> of an enhanced voucher family.

Section 8 Renewal Policy Guidebook § 11-3(B), at pp. 3–4.[9] The Hayes family and the dissent assert that we should defer to HUD's interpretation of the enhanced voucher provision. But as an agency interpretation contained in a guidance document it lacks the force of law and is not entitled to *Chevron* deference. *See Christensen v. Harris County*, 529 U.S. 576, 587 (2000). At most, HUD's interpretation is "entitled to respect" to the extent that it has "the power to persuade." *Id.* (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

We do not dispute that HUD has "relative expertise" in administering the statutory scheme or that HUD has long held its position on nonrenewal of enhanced-voucher tenancies. *See* Dissenting Op. at 17. But expertise and consistency do not

---

[9] Currently pending is a proposed rule which seeks to "codify [HUD's] existing policy concerning . . . the right of enhanced voucher holders to remain in their units." Tenant-Based Assistance: Enhanced Vouchers, 81 Fed. Reg. 74,372 (proposed October 26, 2016) (to be codified at 24 C.F.R. pt. 982). The proposed rule would amend 24 C.F.R. § 982.309 to add a paragraph acknowledging enhanced-voucher tenants' right to remain absent "repeated lease violation or other good cause." *Id*. at 74,375. It goes without saying that this proposed rule lacks the force of law, and so has no impact on the present case.

alone require deference.[10] *See Hagans v. Comm'r of Soc. Sec.*, 694 F.3d 287, 304–05 (3d Cir. 2012). We also consider "the thoroughness evident in [the agency's] consideration, the validity of its reasoning . . . and all those factors that give it the power to persuade." *Young v. United Parcel Service, Inc.*, 135 S. Ct. 1338, 1352 (2015). Here, the "brevity" of HUD's statements and "undeveloped reasoning counsel toward a lower level of deference." *Hagans*, 694 F.3d at 305. For the reasons discussed above, HUD's statement that "owners must continually renew the lease of an enhanced voucher tenancy," contained in one paragraph of HUD's nearly 200-page Section 8 Renewal Guidebook, is not supported by the statute's clear text. HUD's iterations of its nonrenewal policy do not show otherwise.

---

[10] Our dissenting colleague suggests that *Hagans* instructs "a relatively high level of deference is warranted," because the "same factors are at play here." Dissenting Op. at 18–19. We disagree. The *Hagans* Court concluded that a high level of deference was warranted in that instance because, *inter alia*, it determined that: the Social Security Administration is an agency with "exceptionally broad authority to manage a complex, nationwide administrative system," that administering the Social Security Act is the SSA's "central purpose," and that the "SSA has developed a massive body of expertise [over] 56 years" which it has "consistently applied . . . during the past 20 years." *Hagans*, 694 F.3d at 305. Importantly, the *Hagans* Court also found that "the SSA's interpretation of [the statute at issue was] sufficiently persuasive to defer to it." *Id.* While these factors in *Hagan*—considered together—counseled for deference, such factors are not present here.

We further acknowledge that, in the framework of non-binding *Skidmore* deference that the dissent references, an agency may be entitled to some degree of deference given its "specialized experience," and given the "value of uniformity." *United States v. Mead Corp.*, 533 U.S. 218, 234 (2001) (quoting *Skidmore*, 323 U.S. at 140–41)). Our dissenting colleague suggests that our holding imposes a particularly high "risk of disuniformity" because, in *Park Village*, the Ninth Circuit supposedly "ruled in favor of HUD's interpretation." Dissenting Op. at 17. The majority does not, however, create any such "disuniformity." *Park Village*'s holding was limited to the question before it—involving a midterm eviction for nonpayment—and the majority agrees with the disposition of that limited question. *See Park Village*, 636 F.3d at 1153 ("Plaintiffs have a statutory right to remain in the complex, and are, accordingly, entitled to an injunction barring Defendants from evicting them solely because they are paying only their statutorily determined portion of each month's rental payment."). Cabining the "right to remain" in this instance does not create "disuniformity."

Given the enhanced voucher provision's clear directive that, other than the four enhanced voucher distinctions, assistance "shall be voucher assistance under subsection (o) of this section," 42 U.S.C. § 1437f(t)(1), its silence on nonrenewal, and the Hayes family's failure to point us to any other part of the statute supporting a rejection of § 1437f(o)(7)(C)'s clear text as applied to the enhanced voucher provision, we find HUD's guidance unpersuasive insofar as it interprets the enhanced voucher provision as extending the requirement of cause to nonrenewals.

We do not believe our holding today will render the protections of the enhanced voucher provision meaningless or produce a result at odds with the drafters' intentions. The right

26

conferred by the enhanced voucher provision is the right to receive and use enhanced vouchers to satisfy an assisted family's rental obligations. As HUD has advised property owners, enhanced voucher assistance aims "to mitigate the *impact of the conversion action* on the family's rent." Memorandum for Multifamily Project Owners from Benjamin T. Metcalf, Deputy Assistant Sec'y for Multifamily Housing Programs (June 5, 2014) (emphasis added), https://portal.hud.gov/hudportal/documents/huddoc?id=Right _Remain.pdf. Nothing in the statute's language, or otherwise, indicates that it aims to provide assisted families with the right to a perpetual tenancy terminable only for cause.[11] Additionally, "[t]he HUD regulation merely creates a floor of protection, which local laws may enhance." *Barrientos*, 583 F.3d at 1207. *See id.* at 1211 ("Congress and HUD never explicitly rejected the application of more protective local standards to assisted tenants, and in certain cases, expressly allowed for it." (citing 42 U.S.C. § 1437f(o)(7)(D)(vi) and 24 C.F.R. § 982.53(d)). Our holding simply defines that floor in the context of nonrenewals.

---

[11] Contrary to the dissent's suggestions, the idea of a perpetual lease is not a "strawman." *See* Dissenting Op. at 23. Because the statute does not by its terms require cause for nonrenewal, any limitations on nonrenewal would necessarily come from the HAP contract or related lease. After those documents have expired, extending any of their limitations would in effect be subjecting the property owners to a perpetual tenancy. The statute does not, however, provide for a perpetual tenancy. In referring to the question of a perpetual tenancy as a "strawman," the dissent fails to consider the actual implications of its interpretation of the enhanced voucher provision.

27

Because the enhanced voucher provision does not compel a property owner to renew an enhanced-voucher tenancy after the natural expiration of its lease term, we need not determine whether Harvey had cause to terminate under the statute. Harvey is not barred from initiating eviction proceedings in accordance with state and local law.

IV.     Conclusion

As the Supreme Court recently observed, "reasonable people can disagree with how Congress balanced the various social costs and benefits" in a certain area—here, affordable housing for low-income families. *Henson v. Santander Consumer USA, Inc.*, 137 S. Ct. 1718, 1725 (2017). "Constant competition between constable and quarry, regulator and regulated, can come as no surprise in our changing world. But neither should the proper role of the judiciary in that process—to apply, not amend, the work of the People's representatives." *Id.* at 1726.

The judgment of the District Court will be affirmed.

GREENAWAY, JR., *dissenting*.

The Hayes family has lived at 538B Pine Street for 35 years, and a federal statute provides that they "may elect to remain" in their home. 42 U.S.C. § 1437f(t)(B). They elected to remain in their home. They were model tenants, according to their landlord. And yet, they now will find themselves evicted. The majority has struck their Congressionally provided right from the statute, leaving nothing in its place.

According to the majority, a family "may elect to remain" in their home, but their landlord need not heed that election: he can still evict them without cause. It concludes that tenants' rights are empty words unless a statute is also expressly phrased in terms of a property owner's obligation. This renders tenants' statutory entitlement to choose to remain the most evanescent of rights: good only until the moment it is required. This is not what Congress intended and it is not what Congress enacted.

Indeed, the majority's interpretation is at odds not only with the statutory text, but with the interpretations of the other two branches of government as well. HUD—the expert agency tasked with administering this statute—has found a right to remain. Every court to interpret this statute, until this litigation, has found a right to remain. There is complete consensus on what this statute means: landlords may not evict enhanced voucher-holders without cause. The majority all but ignores these cases and administrative interpretations, even as it instead battles the strawman of perpetual tenancies that can never be ended—an interpretation that no one advances: not the Hayes family, not HUD, and not other courts. As a result, this Court is left standing alone. I must dissent.

1

*     *     *

I begin with the text of the statute.[1]  "[E]very exercise of statutory interpretation begins with plain language of the statute itself." *Idahoan Fresh v. Advantage Produce, Inc.*, 157 F.3d 197, 202 (3d Cir. 1998).

The Hayes family claims their rights under paragraph (B) of the enhanced voucher statute.  42 U.S.C. § 1437f(t)(B).[2]

---

[1] Although the majority indicates that it is the "HAP contract and related lease" that "subject" Harvey to the requirements of Section 8, it provides no support for this statement.  Maj. Op. at 10 n.1.  Nothing in Section 8 conditions its effect—the power of a federal statute—on common law devices like contracts and leases, although the statute does use such devices to carry out its scheme.  Put differently, Congress can legislate without authorization from a private contract.  Indeed, other courts have held that the enhanced voucher statute can impose requirements even on landlords who are not covered by a HAP contract.  *See Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr.*, 636 F.3d 1150, 1161-62 (9th Cir. 2011).  Particularly given that the contract and lease terms are not implicated in this litigation, it is the statute, and only the statute, which is the source of the obligations at issue.  The majority correctly proceeds with a statutory analysis, but fundamentally misstates the source of the statute's power: Article I of the Constitution, not private agreements.

[2] The majority begins its analysis with a different provision, that governing the procedure for opting out of project-based Section 8 assistance.  42 U.S.C. § 1437f(c)(8).  I agree that this provision does not govern the case; indeed, no one argues that it does.  Maj. Op. at 12 ("The parties do not

2

On its face, this paragraph contains two separate provisions. First, the enhanced voucher gives families holding enhanced vouchers the choice to remain in their homes. Specifically, it provides that "the assisted family may elect to remain in the

_____

dispute both that Pine Street Associates satisfied its obligations under the opt-out provision and that the Hayes family's assistance converted to tenant-based assistance."). The opt-out provision governs tenants' rights *before* an enhanced voucher is provided; the enhanced voucher statute governs their rights afterward. Only the latter is at issue here. As the majority notes, the former owners chose to opt out of project-based assistance in 2008, satisfied their obligations during the one-year opt-out notice period, and the Hayes family's assistance converted to enhanced vouchers in 2009. Maj. Op. at 6. The opt-out provision details obligations that were, by all accounts, long-satisfied.

Contrary to the majority's accusation, I do not ignore the opt-out provision. We do not even disagree about the provision's importance. Section 1437f(c)(8) triggers the provision of an enhanced voucher, which we all agree has already occurred. It does not govern what protections an enhanced voucher provides once the opt-out is complete—again, an issue on which we agree. Maj. Op. at 12 ("it is silent on a property owner's termination rights following that notice period"). Since the majority never argues that § 1437f(c)(8) changes the interpretation of the enhanced voucher statute, rather than triggering its applicability, nothing is being read out of context. I merely proceed directly to the area of our disagreement.

3

same project in which the family was residing on the date of the eligibility event for the project . . . ." *Id.*

Then, it establishes a higher payment standard, as compared to ordinary vouchers, if they exercise that right. *Id.* ("and if, during any period the family makes such an election and continues to so reside, the rent for the dwelling unit of the family in such project exceeds the applicable payment standard . . . , the amount of rental assistance provided on behalf of the family shall be determined using a payment standard that is equal to the rent for the dwelling unit . . ."). The payment standard is not at issue in this litigation.

The majority summarily concludes that the first provision, which provides that "the assisted family may elect to remain" in their home, does not create a right to remain because it "does not limit property owners' nonrenewal rights." Maj. Op. at 13. But while the statute does not expressly refer to property owners' rights in those terms, it does not need to. Indeed, the majority seems to write as if there were a clear-statement rule for statutes affecting property owners. There is not. Congress need not legislate from the landlord's perspective.

The choice to remain is the choice not to leave, or not to be forced to leave; remaining is the opposite of having one's tenancy terminated. Or, put differently, extending this right to a tenant necessarily limits the rights of a landlord: if a statute guarantees tenants hot water, it also limits a property owner's right *not* to install hot water plumbing.

The structure of the paragraph underscores why the majority's empty reading of the "may elect to remain" language cannot be right. We must give effect to each piece of

4

the statute, "so that no part will be inoperative or superfluous, void or insignificant." *Corley v. United States*, 556 U.S. 303, 314 (2009). There are two independent provisions in paragraph (B) of the enhanced voucher statute—the right to remain and the payment standard—and the majority gives effect to only one.

The majority insists that this paragraph in fact provides enhanced voucher-holders with only one right, that to an increased payment standard (and its corollary, the right to actually use that increased payment). Maj. Op. at 14-15. But this is at odds with the basic structure and grammar of the paragraph. The language providing that voucher holders "may elect to remain," grants tenants a separate right on top of the increased payment standard. The "may elect to remain" clause comes first and stands independently. 42 U.S.C. § 1437f(t)(B) ("[T]he assisted family may elect to remain in the same project in which the family was residing on the date of the eligibility event for the project, and if, during any period the family makes such an election . . . ."). It is not conditioned on what follows. The payment standard is then separated by the words "and if." As such, the rest of the paragraph—the payment standard—is separate, subordinate, and conditional.

These textual details reflect the history of the statute and not mere grammatical jousting. The enhanced voucher statute was originally enacted in 1999. At that time, it did not provide that tenants may elect to remain in their units. In that original iteration, it stated only that "during any period that the assisted family continues residing in the same project in which the family was residing on the date of the eligibility event for the project, . . ." the higher rental assistance payments should be provided. Pub. L. No. 106-74, § 538, 113 Stat. 1047, 1122 (1999). Thus, in 1999, this paragraph gave enhanced voucher-

5

holders one right only: that to an increased payment. This original language made a tenant's continued residency in a project a condition for receipt of the enhanced voucher's additional rental assistance, but not a right in and of itself.

But in 2000, Congress amended the enhanced voucher statute and added the "may elect to remain" language. Military Construction Appropriations Act, 2001, Pub. L. 106-246 § 2801, 114 Stat. 511 (2000). Congress changed the enhanced voucher, adding new language and providing tenants new protections. *See also Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr.*, 636 F.3d 1150, 1154 (9th Cir. 2011) ("[I]n 2000, Congress amended the enhanced voucher provision to make it *even more protective of tenants*.") (emphasis added). This legislative action must be given meaning, effect, and force. "When Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect." *Stone v. INS*, 514 U.S. 386, 397 (1995). An interpretation of the enhanced voucher statute that treats the "may elect to remain" language as mere scene-setting for the operative discussion of rent calculations renders the 2000 version of the statute indistinguishable from the 1999 version of the statute. Congress intended that its amendment change the meaning of the statute. Our interpretation must effectuate that enactment. By providing that tenants "may elect to remain" in their homes, Congress must have given them some right that they did not enjoy previously: specifically, a right to remain.

It is a truism that tenants may choose to stay in their apartment, if their landlord lets them. That describes not only the 1999 version of the enhanced statute, but the baseline condition of landlord/tenant relations: tenants may petition to renew their leases and hope that their landlords agree. It is

6

similarly a baseline principle that, absent some reason enumerated in the lease or authorized by law, tenants may not be evicted mid-lease term. The scope of the right to remain embodied in the 2000 amendment must do more than codify these basic precepts. Congress did not amend its own statute just to reiterate, in new language, what was already true. Such a right to remain would be no right at all.

Yet this is exactly how the majority defines the right to remain. Under the majority's interpretation, the "may elect to remain" language only applies during the lease term, and a tenant's ability to stay in their home evaporates the second it is actually needed, *i.e.*, whenever their lease ends and their landlord wants them out. In effect, the majority's interpretation of the enhanced voucher statute is no different than a court taking a black marker to the opening lines of the statute and to Congress's 2000 amendment. It operates as a total excision of statutory text and meaning. Such an interpretation usurps the very role of Congress that the majority claims to be upholding.[3]

---

[3] The majority insists that courts must uphold the political branches' decision about how to balance social costs and benefits. Maj. Op. at 26 (quoting *Henson v. Santander Consumer USA, Inc.,* 137 S. Ct. 1718, 1725 (2017)). Yet even as it denies effect to a Congressional enactment and entirely ignores the wisdom of the Executive Branch (HUD's guidance), it strews its opinion with references to the policy imperative of encouraging landlord participation in Section 8 (a red herring in the narrower context of enhanced vouchers), Maj. Op. at 4, 16-17, solemnly intones about property owners' rights, and the "burden[s]" placed upon them, Maj. Op. at 21 n.7, and insists that, the Hayes family's imminent eviction

The majority pleads that it has not stripped all meaning from the words "may elect to remain." It opines that those words "make clear that, following a valid opt-out, HUD could not force an assisted family to leave the unit." Maj. Op. at 15 n.3. But this interpretation still fails to solve the problem: it fails to give the 2000 amendment independent meaning. As the majority acknowledges, the 1999 version of the statute already required HUD to provide enhanced vouchers to eligible families. Maj. Op. at 14; Multifamily Assisted Housing Reform and Affordability Act of 1997 § 524(d), Pub. L. No. 106-74, § 531, 113 Stat. 1047, 1113 (1999) (codified as amended at 42 U.S.C. § 1437f note) ("[T]he Secretary shall make enhanced voucher assistance under section 8(t) of the United States Housing Act of 1937 (42 U.S.C. 1437f(t)) available on behalf of each low-income family who, upon the date of such expiration, is residing in an assisted dwelling unit in the covered project."). This obligation necessarily prohibits HUD from forcing eligible families out of their homes. After all, the requirement that HUD issue the vouchers is meaningless if HUD can remove tenants itself and eliminate the need for the vouchers in the first place. Thus, the majority's interpretation renders the 2000 amendment superfluous.

Moreover, the majority does not even attempt to ground its interpretation of a HUD-only duty in the text of the statute. The enhanced voucher statute, as amended, provides that "*the assisted family* may elect to remain in the same project in which the family was residing on the date of the eligibility event for the project . . . ." 42 U.S.C. § 1437f(t)(B) (emphasis

notwithstanding, its interpretation will adequately protect tenants. Maj. Op. at 24-25. I fear that my colleagues may be treading into the deep waters of policymaking.

8

added). HUD is not mentioned in this clause, nor even alluded to. The statute does not read "the Secretary shall." Rather, as a purely textual matter, this is a right granted to the voucher-holding family. *Cf. Gonzaga Univ. v. Doe*, 536 U.S. 273 (2002) (looking to whether a statute's text is "phrased in terms of the persons benefited"). The tenants are given the right to remain, and the statute places no limit on whom that right may be exercised against.

If this text can be read to bar HUD from forcing out an assisted family, it must also bar a landlord from forcing out an assisted family, for the family's right is not limited to exercise against one or the other party. The majority's insistence that the right to remain can be exercised only against HUD is an entirely extra-textual invention—one equally without support from judicial opinions or administrative materials.

The majority also suggests that a right to remain "would be a significant departure from the ordinary voucher provision," which requires cause to terminate a tenancy only during a lease term, not upon renewal. Maj. Op. at 16. But an enhanced voucher is just that: enhanced. The statute is, by its very title, meant to be a departure from the ordinary voucher provision. An interpretation that assumes enhanced vouchers must offer the same protections as ordinary vouchers badly misunderstands the statutory scheme.

This attempted homogenization of the enhanced and ordinary voucher statutes continues by reference to the two programs' ostensibly shared purpose. But there is no reason to believe that on this particular issue of when a landlord must renew a voucher-holder's lease, Congress intended the two statutes to be read as if they were one. The policy contexts in which the ordinary voucher and enhanced voucher provisions

9

operate are entirely different, as other courts have explained. *Estevez v. Cosmopolitan Assocs. LLC,* No. 05CR–4318, 2005 WL 3164146 (E.D.N.Y. Nov. 28, 2005) (contrasting purposes of the two programs). Until 1996, landlords were obligated to renew the leases of ordinary voucher-holders, unless they had good cause to evict.[4] This "endless lease" provision was repealed to encourage participation by landlords in the voucher program, which operates across the entire housing marketplace. The landlord-friendlier terms were an effort to create a larger pool of voucher-accepting landlords. The majority repeatedly assumes that the same Congressional purpose applies to enhanced vouchers. Maj. Op. at 4, 16-17 & n.4.

But enhanced vouchers are available only to tenants living in buildings that formerly received project-based section 8 assistance. The set of landlords affected is small and, more importantly, relatively fixed, as compared with the full

---

[4] Textually, this "endless lease" provision is irrelevant. It was repealed for ordinary vouchers in 1996. The enhanced voucher was created in 1999, and the right to remain in 2000. The "endless lease" provision came and went before enhanced vouchers ever existed. Its repeal does not directly affect the enhanced voucher statute. Nor can it offer many clues as to the intent of the 2000 Congress. If "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one," *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 117 (1980) (quoting *United States v. Price*, 361 U.S. 304, 313 (1960)), then the views of an earlier Congress have less value still for discerning the intent behind a superseding statute.

10

marketplace of all rental property owners.[5]  Most landlords cannot accept enhanced vouchers, and decisions about whether to apply for project-based assistance (and then potentially opt out) are measured in decades rather than months.  Congress might therefore have perceived less need to encourage landlord participation: it could have concluded that most property owners affected were already in the program.  Meanwhile, ordinary voucher holders move through the private housing market like ordinary consumers.  But because enhanced voucher holders all previously benefited from project-based subsidies, linked to particular buildings, Congress might have considered them more deserving of a right to stay in those particular buildings (just as the Hayes family has lived in their home for 35 years, since it was first built).[6]  Thus, Congress

---

[5] To quantify this, as of 2014, there were fewer than 17,000 properties receiving project-based Section 8 assistance.  Around one-fifth of project-based Section 8 properties had left the program in the previous ten years.  U.S. Dep't of Hous. and Urban Dev., Off. of Policy Dev. and Research, Opting In, Opting Out a Decade Later (2015).

[6] The majority also claims that tenants in buildings receiving project-based assistance can be evicted at the end of their lease, without cause.  Maj. Op. at 17.  This is simply not so.  The statutory provision the majority cites refers only to a tenant's protections "during the term of the lease."  24 U.S.C. § 1437f(d)(1)(B).  Through binding regulations, HUD has addressed the relevant time period: what happens *after* a lease term expires.  Then, an owner cannot "refuse to renew a lease without good cause."  The Housing and Economic Recovery Act of 2008 (HERA): Changes to the Section 8 Tenant-Based Voucher and Section 8 Project-Based Voucher Programs, 79

11

might well have weighed landlord incentives against tenant protections differently in this context. *See also Estevez*, 2005 WL 3164146 at \*6 ("[P]recisely *because* of the repeal of the endless lease provision, it made perfect sense for Congress to enact a law expressly intended to protect eligible tenants (through the use of enhanced vouchers) from losing their homes upon the expiration of project-based assistance contract.").

The majority cannot know that Congress did not draw these distinctions between ordinary and enhanced vouchers. It has no basis to assume that the enhanced voucher statute—which was enacted by a different Congress, looking at a different population of beneficiaries, regulating a different set of landlords, and serving different purposes than the ordinary voucher provisions—must nevertheless provide the same protections upon the expiration of a lease as an ordinary voucher. *Cf.* Section 8 Housing: Hearing Before the Sen. Subcomm. on Hous. and Transp., 106th Cong. (1999) (written testimony of Rep. Rick Lazio, Chairman, H. Subcomm. Hous. and Cmty.) (stating that the purpose of the enhanced voucher statute is to "allow particularly vulnerable populations the ability to remain in their own homes"). Congress explicitly provided that enhanced voucher holders—and not ordinary voucher holders—"may elect to remain." We must give effect

---

Fed. Reg. 36,146, 36,148 (June 25, 2014) (final rule); *see also* 24 C.F.R. § 983.257 (2017) (reflecting codification). As HUD explained, this rule was enacted because residents in affordable projects are meant to have a "reliable long-term lease." 79 Fed. Reg. at 36,148. The right to remain ensures that even if a landlord opts out of project-based assistance, a tenant retains the same protections she had.

12

to that language, not erase it based on the policy concerns of a separate program.

The text of the statute, as well as its history and structure, makes clear that Congress has granted enhanced voucher holders a right to remain. The majority's interpretation of the statute, which holds that Congress offered tenants *no* new right when it amended the enhanced voucher statute to provide that tenants "may elect to remain" in their homes, is plainly foreclosed. As between "some right to remain" and "no right to remain," Congress's choice is clear. But as is often the case, the text does not detail the precise bounds of that right to remain: that task has been left to the courts and to HUD, both of which have undertaken it. The majority declines the responsibility here.[7] Because Congress chose to use solely the "may elect to remain" language, rather than a detailed elaboration of the right to remain, it has left a gap in the statute. "Filling these gaps . . . involves difficult policy choices that agencies are better equipped to make than courts," *Nat'l Cable & Telecomm. Ass'n v. Brand X Internet*

---

[7] The majority notes, correctly, that the text of the statute does not reference any limitation on the right to remain. It therefore suggests that there can be no justification for the rule I (and HUD and other courts) would adopt, which allows for nonrenewals for good cause. Maj. Op. at 21 n.8. But an ambiguity regarding the *scope* of the right to remain does not mean that a right to remain does not exist. When a statute is ambiguous, "we are left to resolve that ambiguity." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 345 (1997). The majority writes as if any uncertainty in a statutory provision renders that provision meaningless. Our volumes of decisions interpreting statutes make obvious that this is not so.

13

*Servs.*, 545 U.S. 967, 980 (2005), and in the first instance, I would look to HUD to define the details of the right to remain. Because HUD has, in fact, stepped into that gap and expanded on the statutorily-required right to remain, it is to HUD's interpretation I now turn.

\*　　\*　　\*

The text alone is more than enough to conclude that the statute provides a right to remain,[8] but the statutory text is not the only legal material in play here. HUD has repeatedly interpreted the enhanced voucher statute: at every point, the agency has asserted that the statute provides a right to remain, obligating landlords to renew the leases of enhanced voucher-holders unless there is good cause to terminate the tenancy. Our precedent mandates that this interpretation is entitled to substantial, albeit non-binding, deference.

HUD first put forward its interpretation of the right to remain in a version of its Section 8 Renewal Policy Guide published in January 2001, immediately after the enhanced voucher statute was originally enacted. Dep't of Hous. & Urban Dev., Section 8 Renewal Policy: Guidance for the Renewal of Project-Based Section 8 Contracts (2017); *see also* Dep't of Hous. & Urban Dev., Notice PIH 2001-41, Section 8 Tenant-Based Assistance (Enhanced and Regular Housing Choice Vouchers) For Housing Conversion Actions – Policy

---

[8] The Ninth Circuit agrees: the text of the statute alone is enough to find a right to remain. *Park Vill.*, 636 F.3d at 1157 (denying right to remain would "flout the clear language of the statute"). Deference to HUD reinforces that conclusion.

14

and Processing Guidance (2001) (describing 2001 version of Guide), JA 274-308.

The Policy Guide lays out that "Owners may not terminate the tenancy of a tenant who exercises this right to remain except for cause under Federal, State or local law." Section 8 Renewal Policy § 11-3. Moreover, the Guide clarifies that the right to remain continues indefinitely, including after the expiration of a lease term. It provides that "[t]his protection continues after the first lease term" and that "owners must continually renew the lease of an enhanced voucher family." *Id.* According to HUD, owners may only choose not to renew a lease if the property is no longer being offered as rental housing, if they have good cause to terminate the tenancy under Federal, State or local law, or if the local housing authority ceases to find the rent being charged reasonable. *Id.*

The Renewal Policy Guide further demonstrates that the right to remain is integrated into the larger Section 8 scheme, including the opt-out provisions. For example, the Guide references the right to remain in a sample notice for landlords to provide tenants before opting out of project-based Section 8 assistance. That letter notifies tenants that "As an owner, we will honor your right as a tenant to remain at the property on this basis as long as it continues to be offered as rental housing, provided that there is no cause for eviction under Federal, State or local law." *Id.* App. 11-3. It also instructs agency officials processing an opt-out to ensure that the owner sent such a letter stating "that the owner will honor the right of tenants to remain" and that the owner "certif[ied] that it will honor the tenant's right to remain at the project as long as the project continues to be offered for rental housing . . . unless the owner has grounds for eviction . . ." *Id.* § 8-3.

15

The Guide also clearly roots its interpretation in the text and history of the statute. In recounting the legislative history of Section 8, it observes that the 2000 amendment to the statute "amended the enhanced voucher statute at Section 8(t) of the United States Housing Act to grant enhanced voucher families the right to remain." *Id.* § 1-2. Accordingly, this is not some stray remark, but a core, considered aspect of HUD's administration of Section 8.

HUD reaffirmed this interpretation in a notice issued in 2001. Dep't of Housing & Urban Dev., Notice PIH 2001-41. In guidance, HUD stated that:

> A family that receives an enhanced voucher has the right to remain in the project as long as the units are used for rental housing and are otherwise eligible for housing choice voucher assistance. . . . The owner may not terminate the tenancy of a family that exercises its right to remain except for a serious or repeated lease violation or other good cause.

*Id.* at 26, JA 297. As in the Renewal Policy Guide, the agency again identified this policy as deriving directly from the 2000 amendments to the statute, which it described as providing "that families have the right to elect to remain in the same project with enhanced voucher protection." *Id.* at 3, JA 276.

HUD has consistently restated—and perhaps more importantly, applied—this interpretation of the right to remain. In 2014, it wrote a pair of letters, one to public housing authorities and one to landlords, reiterating that enhanced vouchers have a right to remain in their apartments, even beyond the first year of assistance. JA 272-73. HUD has

16

repeatedly reissued the Section 8 Renewal Policy Guide, most recently in 2017, without revisions relevant to this litigation. And in 2016, HUD issued a proposed rule on enhanced vouchers. Tenant-Based Assistance: Enhanced Vouchers, 81 Fed. Reg. 74,372 (Proposed Oct. 26, 2016). This rule, which if finalized would "codify" HUD's existing enhanced voucher policies, would "provide that, absent repeated lease violation or other good cause, a family that receives an enhanced voucher has a right to remain in the project," pursuant to the "statutory requirement" of 42 U.S.C. § 1437f(t)(1)(B). *Id.* at 74,375.[9]   HUD is clear and consistent: to terminate an enhanced voucher holder's tenancy, even at the end of a lease term, good cause is required. For each of the sixteen years since the "may elect to remain" language has been a part of the statute, HUD has administered the right to remain in the same way.

I agree with the majority that HUD's interpretation, put forth in guidance, letters, and other materials without the force of law, is not entitled to binding *Chevron* deference. *Christensen v. Harris County*, 529 U.S. 576, 587 (2000) ("Interpretations such as those in opinion letters—like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant *Chevron*-style deference."). But, as the Supreme Court has held, just because interpretations "do not fall within *Chevron* is not, however, to place them outside the pale of any deference whatsoever." *United States v. Mead*

---

[9] While this proposed rule currently lacks the force of law, it does indicate that HUD still holds its long-time position and that it is putting forward that interpretation through increasingly formal processes.

17

*Corp.*, 533 U.S. 218, 234 (2001). The majority peremptorily dismisses HUD's interpretations as unpersuasive. Our precedent mandates more deference than this.

Various factors—some not even discussed by the majority, and none meaningfully credited—require additional deference here. We grant additional deference to an "unchanging policy," *Hagans v. Comm'r of Soc. Sec.*, 694 F.3d 287, 304-05 (3d Cir. 2012) (citing *Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 492 (2004)) and to interpretations issued contemporaneously with the statute. *Id.* (citing *Madison v. Res. for Human Dev., Inc.*, 233 F.3d 175, 187 (3d Cir. 2000)). Here, HUD first found that enhanced vouchers provided a "right to remain" in 2001, immediately after the statute was originally enacted, and never wavered from that interpretation through the pendency of this litigation. We "normally accord particular deference to an agency interpretation of longstanding duration." *Barnhart v. Walton*, 535 U.S. 212, 220 (2002) (internal quotations omitted). Yet the majority grants this interpretation no deference at all.

Likewise, the Supreme Court has instructed that even in the non-binding framework of *Skidmore* deference, "given the value of uniformity in [an agency's] administrative and judicial understandings of what a national law requires," courts should defer to agencies where a failure to defer risks fracturing an otherwise uniform scheme. *Mead*, 533 U.S. at 234. Section 8 is just such a national program, and the costs of disuniformity are high. *See Butler Cty. Mem'l Hosp. v. Heckler*, 780 F.2d 352, 357 (3d Cir. 1985) ("[P]ublic policy favors consistent, nationwide application of rules in social welfare programs."). Moreover, the risk of disuniformity is particularly high here. Another circuit has ruled in favor of HUD's interpretation, *Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Trust*,

18

636 F.3d 1150 (9th Cir. 2011), and HUD has been applying this interpretation in practice for the statute's full lifetime. The majority is creating disuniformity, not resolving it. Confusion—and perhaps non-acquiescence—is sure to follow. This is another factor militating for deference, one that the majority entirely ignores.

Next, we look to whether an agency has "relative expertise" in administering the scheme. *Hagans*, 694 F.3d at 305; *see also United States v. Miller*, 833 F.3d 274, 281-82 (3d Cir. 2016). There is no dispute that HUD is the expert agency tasked with administering Section 8. We are instructed to credit the agency's hands-on, decades-long engagement with the enhanced voucher statute and its administration—and would be wise to do so.

The majority's argument against deference is that "the 'brevity' of HUD's statements and 'un[der]developed reasoning counsel toward a lower level of deference.'" Maj. Op. at 23 (quoting *Hagans*, 694 F.3d at 305). Beyond that, the majority only conclusorily states that it is not persuaded. Even if I were to accept that HUD's many statements lack thoroughness—which I do not, given that the agency has clearly stated that it believes its interpretation is mandated by statute—this is not enough to so quickly disregard the agency's insights. The majority does not explain what additional reasoning it seeks from the agency, or why it considers the agency's expertise unimportant here. It simply rejects HUD's interpretation. *Skidmore* deference is a "sliding-scale," *Hagans*, 694 F.3d at 304, and not an "either-or choice," *Mead*, 533 U.S. at 238, yet the majority behaves as if the agency's interpretation is entirely without import to our interpretation.

19

Indeed, the very language from *Hagans* that the majority cites demonstrates its disregard for our precedent on *Skidmore* deference. The *Hagans* court noted that the "brevity" and "underdeveloped reasoning" of the relevant agency interpretation counseled for a lower level of deference, but concluded that *overall*, given the agency's expertise, its consistent application of its interpretation, and the need for uniformity, "a relatively high level of deference is warranted." 694 F.3d at 305. Precisely the same factors are at play here: *Hagans* instructs that a relatively high level of deference is warranted here as well.

All this is not to say that we are obligated to accept HUD's interpretation, for we are not. I began with the statute's text and find that more than sufficient to establish a right to remain. But we are obligated to pay heed to HUD's interpretation and, given HUD's consistency, its expertise, and the virtues of uniformity, to give substantial weight to that interpretation. The majority, in its rush to erase the protections of the enhanced voucher statute, fails entirely to engage with this administrative expertise, much less to defer to it. This approach disregards the executive branch's hard-won wisdom in the interpretation and application of this program.

\* \* \*

The interpretation I propound here—there is a right to remain—is also shared by every other court to interpret the enhanced voucher statute, until this litigation. The most analogous case to this one is the Ninth Circuit's decision in *Park Village Apartment Tenants Association v. Mortimer Howard Trust*, 636 F.3d 1150 (9th Cir. 2011). There, as here, a group of tenants of a formerly project-based housing complex argued that they had a right to remain and to pay their rent

using enhanced vouchers. The Ninth Circuit found that the enhanced voucher statute "provides tenants a right to remain in their previously subsidized Section 8 rental units in the absence of just cause for eviction." *Id.* at 1163. I need not recite the Ninth Circuit's arguments—they are the same ones already outlined here, including arguments from plain text and the enactment history of the statute, as well as deference to HUD. Notably, the Ninth Circuit also explained the problems with the very same arguments that the majority now embraces. For example, the Ninth Circuit clearly explains why there is no conflict between the rights given to tenants during the one-year notice period for opting out of project-based assistance—which precedes the issuance of an enhanced voucher—and the rights provided by an enhanced voucher—which comes after project-based assistance has ended. *Compare id.* at 1158 *with* Maj. Op. at 14-15.

Nothing distinguishes the Hayes' case from *Park Village*: there are no material factual differences, nor intervening legal changes. *Park Village* does not rely on inapplicable Ninth Circuit precedents. For the questions at issue here, it is on all fours with this litigation.

The majority purports to distinguish *Park Village* on the basis that it concluded only that landlords cannot evict a tenant for paying their rent with an enhanced voucher. Maj. Op. at 18. *Park Village* does conclude this, even as it also concluded that the statute provides the right to a lease renewal. The Ninth Circuit was presented with multiple issues, and it issued multiple holdings. *See Park Vill.*, 636 F.3d at 1151-52 ("[Plaintiffs] argue that federal law gives them a right to remain in the complex *and* to pay a portion of their rent by using federally funded 'enhanced vouchers.' Defendants, who own the housing complex, argue that the tenants have no right to

21

remain in the complex *or* to use such vouchers to pay their rent." (emphasis added)). The majority's claim that *Park Village* rejects a right to lease renewal is plainly belied by the Ninth Circuit's opinion, which, among other things, relies on HUD's interpretation, including HUD's statement that "owners must continually renew the lease of an enhanced voucher family." *Id.* at 1156-57. Quite simply, the majority has conflated one of the Ninth Circuit's holdings with the other.[10] The Ninth Circuit, clearly and repeatedly, holds that the enhanced voucher statute provides a right to remain, including after the expiration of a lease term.

Nor does *Park Village* stand alone. A slew of district court opinions have found that enhanced vouchers provide an open-ended right to remain. Not one agrees with the majority. *Park Vill.*, 636 F.3d at 1157 ("every court to consider the question has concluded that § 1437f(t) affords tenants a right to remain, exercisable as against the owner"); *see also Estevez*, 2005 WL 3164146 at *5-*6 (describing "unfettered right to remain" and rejecting position that "tenants can pay their rent

---

[10] In a footnote, the majority also cites language from the Ninth Circuit concerning a *third* issue presented in *Park Vill.*: whether even if tenants have a right to remain, a court can enjoin the landlord to enter a HAP contract. Maj. Op. at 20 n.6 (citing *Park Village*, 636 F.3d at 1161-62). There, the Ninth Circuit concluded that such an injunction was improper; owners could allow tenants to remain, but forego the extra income provided by an enhanced voucher, if they so chose. 636 F.3d at 1161-62. This issue is not before us, but it demonstrates further that the Ninth Circuit did, in fact, recognize a right to remain—one which potentially extends even beyond the expiration of a HAP contract.

with enhanced vouchers only if the landlord decides to accept them"); *Barrientos v. 1801-1825 Morton, LLC*, No. CV06-6437 ABC (FMOX), 2007 WL 7213974, at \*6, \*8 (C.D. Cal. Sept. 11, 2007), *aff'd on other grounds*, 583 F.3d 1197 (9th Cir. 2009) (concluding "the enhanced voucher provision creates a right for tenants to remain in tenancy" such that tenancies can be terminated only for "the eviction grounds in subsection (o)(7)"); *Jeanty v. Shore Terrace Realty Ass'n*, No. 03 CIV. 8669 (BSJ), 2004 WL 1794496, at \*5 (S.D.N.Y. Aug. 10, 2004) (stating enhanced voucher gives tenant "option to renew her lease so long as the property is offered as rental housing and Plaintiff receives enhanced vouchers, absent good cause to terminate her tenancy under Federal, State or local law" because it is "illogical to provide a tenant with the right to remain without requiring the landlord to offer the tenant the option to renew the lease"); *Feemster v. BSA Ltd. P'ship*, 471 F. Supp. 2d 87, 93 (D.D.C. 2007) (adopting HUD position that statute imposes "requirement to allow families receiving enhanced vouchers who elect to remain do so as long as the property remains a rental property, unless the owner has just cause for eviction"), *aff'd in relevant part*, 548 F.3d 1063 (D.C. Cir. 2008) (no dispute that statute "gives tenants the right to remain in their units").[11]    Not all of these cases detail

_____

[11] The majority is correct that the D.C. Circuit in *Feemster* does not speak to the existence of a right to remain or to landlords' obligations to renew the leases of enhanced voucher holders. 548 F.3d at 1067 (observing that "[t]his is a single issue case" concerning whether the relevant units were being "offered for rental housing"). For that reason, I do not cite to the D.C. Circuit's opinion, but rather the District Court opinion, which as quoted above, does find a right to remain. The majority's attempt to distinguish the D.C. Circuit's

23

specifically the bounds of the right to remain—but all find that it exists.[12]

What does the majority make of this complete consensus? I know not. While these cases do not bind us, we must be "mindful of our obligation to avoid circuit conflict," *PNC Bank Del. v. F/V Miss Laura*, 381 F.3d 183, 186 (3d Cir. 2004), and "widely held views impel us to consider whether the reasoning applied by our colleagues elsewhere is persuasive." *In re Grossman's Inc.*, 607 F.3d 114, 121 (3d Cir. 2010). That enhanced voucher holders have a right to remain is not just a "widely held" view, it is a uniformly held view. The majority's failure to reckon with the judicial consensus is curious but telling.

In failing to acknowledge what other courts have actually held, the majority ends up going after a strawman. The

opinion—by citing dicta, no less—is strange, given that I do not rely on it. It remains the case, though, that the *Feemster* district court, like the others cited above, found a right to remain, and that the majority still has no other court agreeing with its interpretation.

[12] Many of these cases address more specifically the question, not at issue in this appeal, whether when a tenant has exercised her right to remain, the landlord must accept the enhanced vouchers as payment of their rent. *See, e.g.*, *Estevez*, 2005 WL 3164146 at *4 n.2. But their analysis necessarily discusses the existence and, to some extent, scope of the right to remain that the majority denies exists in the statute. Though only *Park Village* is on all fours with this appeal, these other cases are instructive.

majority repeatedly asks whether the enhanced voucher statute creates a "perpetual lease" or "require[s] property owners to continually renew enhanced-voucher tenancies." *E.g.*, Maj. Op. at 16, 17.[13]  I cannot discern any reason why the majority would concern itself with whether enhanced voucher holders have an unbridled right to remain; the only people discussing such a limitless right are the two members of the majority. This is not my position.  This is not Appellants' position.  This is not HUD's position. This is not the position of any other court.[14]

---

[13] Everyone agrees that enhanced voucher holders may be evicted pursuant to Subparagraph (C), which is not at issue here.  The majority's mischaracterization of Appellants' claim is that their tenancy is otherwise eviction-proof.

[14] Surprisingly, the majority's fear of a perpetual tenancy is so severe that it accuses me of "fail[ing] to consider the actual implications of [my] interpretation."  Maj. Op. at 25 n.11.  I would hold that § 1437f(t) grants families eligible for enhanced vouchers a right to lease renewal if they are able to pay their statutorily prescribed portion of rent.  However, enhanced vouchers and the accompanying right to remain are only available to the original family on behalf of whom the voucher was provided; they cannot be transferred to other family members or other third parties.  *See* 42 U.S.C. § 1437f(t)(1)(C)(ii).  Moreover, throughout the tenancy, tenants benefitting from the enhanced voucher program remain subject to the applicable HAP contract and lease agreement.  These documents may provide landlords with additional grounds for terminating the tenancy.  In this case, for instance, the lease allows the Owner to terminate based on, among other things, a history of disturbance, the owner's desire to utilize the

Each of us suggests something more modest: that the right to remain only offers tenants protection against evictions without good cause, including at the termination of a lease term.[15]     *See, e.g.*, *Park Vill.*, 636 F.3d at 1157

---

dwelling for personal, family, or non-residential use, or "[v]iolation of Federal, State, or local law that impose obligations on the Tenant." JA 653.

The majority contends that "[a]fter those documents have expired, extending any of their limitations would in effect be subjecting the property owners to a perpetual tenancy." Maj. Op. at 25 n.11. I suppose, then, that, the majority's fear of a perpetual tenancy is really a concern that Congress has saddled landlords with model tenants who, with their vouchers, pay equal to or above market rent. In other words, the crux of the disagreement between the majority and myself is that my colleagues believe that landlords are not sufficiently protected by the above-listed limitations on the right to remain and indeed require an additional measure of protection—one that is entirely judicially-crafted and finds support in neither the text of the statute nor the agency's longstanding interpretation.

[15] I would remand the question of whether Harvey had good cause to evict the Hayes family, rather than decide it in the first instance, as the District Court did not reach this issue. I note, though, the complexities of determining what constitutes "good cause" in the special context of the enhanced voucher statute. *See Barrientos*, 2007 WL 7213974 at \*7-\*9 (holding that a landlord's desire to increase the market rent is not "good cause"); Tenant-Based Assistance: Enhanced Vouchers, 81 Fed. Reg. 74372, 74374-75 (Oct. 26, 2016) (HUD specifically requesting comments on what should

("[Section] 1437f(t) provides tenants a right to remain in their rental units *absent just cause for eviction*" (emphasis added)); *Barrientos*, 2007 WL 7213974 at *8-9 (holding that "the 'other good cause' provision in subsection (o)(7) applies to enhanced-voucher tenants under subsection (t)" and finding that a desire to lease the unit at a higher rent is not "good cause"); Dep't of Hous. & Urban Dev., Notice PIH 2001-41 at 24 ("The owner may not terminate the tenancy of a family that exercises its right to remain *except for a serious or repeated lease violation or other good cause*" (emphasis added)); Appellant's Br. at 7 (seeking finding "that Defendant Harvey does not have good cause to evict or fail to renew lease for the Hayes family in violation of their Right to Remain").

Given that the majority fails even to recognize the consensus interpretation of this statute, much less meaningfully engage with it, it is perhaps no surprise that it fails to accurately describe that consensus interpretation. As a result, the majority would leave this Court embracing a position that not a single other interpreter—in any of the three branches of government—has advanced. No other court has embraced the majority's position because it is made up out of whole cloth.

\*     \*     \*

The enhanced voucher statute provides a right to remain. This is evident on the face of the text, which provides that tenants "may elect to remain" in their homes and sets that provision apart as an independent right. It is evident from the

---

constitute valid grounds for terminating an enhanced voucher-holder's tenancy, consistent with the statutory right to remain).

27

history of the statute, which was amended specifically to insert that right to remain. HUD has filled out the scope of that right—through interpretations that we must heed—and every other court to consider the issue has recognized that right. The majority confronts an immense array of legal materials, all pointing in the same direction. Rather than face them, it cobbles together conclusory statements and non sequiturs about independent provisions of the enhanced voucher statute. As a consequence, the Hayes family will lose their home.

This home was hard-won. It took repeated intervention by the federal courts to vindicate the Hayes family's right to their home in the first place. *See Society Hill Civic Ass'n v. Harris*, 632 F.2d 1045, 1048-49 (3d Cir. 1980) (recounting history of three federal litigations and two consent decrees resulting in creation of this affordable unit). Since this apartment was built in 1982, the Hayes family have been the only tenants to live there. And for these 35 years, they have been "very good tenants," causing no disturbances, and drawing no complaints. JA 577-78. Now the federal courts are intervening once again, but this time, rather than vindicating the Hayes family's rights, we are rubbing out statutory text and ignoring Congressional intent, leaving them subject to the whim of their landlord. Congress told the Hayes family that they "may elect to remain" at 538B Pine Street. Yet now they are being forced to leave. I dissent.